XEROX CORP. *v.* COUNTY OF HARRIS, TEXAS, ET AL.

No. 81–1489.   Argued November 10, 1982—Decided December 13, 1982

BURGER, C. J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, BLACKMUN, REHNQUIST, STEVENS, and O'CONNOR, JJ., joined. POWELL, J., filed a dissenting opinion, *post*, p. 155.

*Alfred H. Hoddinott, Jr.*, argued the cause and filed briefs for appellant.

*Cheryl Helena Chapman* argued the cause for appellees. With her on the brief for appellee City of Houston was *Jay D. Howell, Jr. John J. Greene* filed a brief for appellee County of Harris.*

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We noted probable jurisdiction to decide whether a state may impose nondiscriminatory ad valorem personal property taxes on imported goods stored under bond in a customs warehouse and destined for foreign markets. The Texas Court of Civil Appeals held such taxes constitutional.

## I

Appellant Xerox Corp. is a New York corporation engaged in the business of manufacturing and selling business machines. Its operations span the globe, and it has established

---

*\*James F. Gossett* filed a brief for the International Association of Assessing Officers as *amicus curiae.*

affiliates in foreign countries to facilitate foreign sales. It has assembly plants and production facilities in Mexico.

Xerox manufactured parts for copying machines in Colorado and New York which were shipped to Mexico City, Mexico, for assembly by its affiliate there. The copiers assembled in Mexico were designed for sale in the Latin American market, and all printing on the machines and instructions accompanying them were in Spanish or Portuguese. Most of the copiers operated on electric current of 50 cycles per second, rather than the 60 cycles per second that is standard in the United States. Many of the copiers assembled by appellant's affiliate in Mexico City were not approved by either United Laboratories or the Canadian Standards Association, as required for sale in the United States. To convert the copiers for domestic sale would have cost approximately $100 per copier.

After assembly in Mexico, the copiers were transported by a customs bonded trucking company to the Houston Terminal Warehouse in Houston, Tex.,[1] a Class 3 customs bonded warehouse. There they were stored for periods ranging from a few days to three years while awaiting sale and shipment to Xerox affiliates in Latin America. The copiers remained in the warehouse, segregated from other merchandise, until a shipment order was received. When Xerox received an order, it would transport the copiers under bond to either the Port of Houston or the Port of Miami, where they were loaded on board vessels for shipment to Latin America. The copiers remained under the continuous control and supervision of the United States Customs Service from the time they entered the bonded warehouse until they cleared

---

[1] Until 1974, Xerox shipped its Mexican-assembled copiers to the Free Trade Zone of Panama, where they were stored tax free. In 1974, rising anti-American sentiment in Panama led Xerox to seek another storage facility. It settled on the Houston warehouse because of the excellent port facilities in the Port of Houston.

148

United States Customs at the Port of Houston or the Port of Miami for export.[2]

None of the copiers assembled in Mexico and stored in Houston were ever sold to customers for domestic use; all were ultimately sold abroad. Consequently, Xerox paid no import duties on them.[3]

The local authorities did not assess any taxes on the copiers stored under customs bond in 1974 and 1975. In 1977, the city of Houston[4] assessed ad valorem personal property taxes of $156,728 on the copiers stored in the Houston warehouse during 1977.[5] The County of Harris[6] followed suit, assessing $55,969 in taxes for 1977 and also assessing $48,426 in back taxes for 1976, for a total of $104,395.

As soon as Xerox learned that the local authorities intended to tax its Mexican-assembled copiers, it shipped all the machines to a foreign trade zone in Buffalo, N. Y., from which it continued to fill orders for shipment to Latin America.

---

[2] Goods stored in customs bonded warehouses are under the "joint custody" of the warehouse proprietor and the United States Customs Service. The United States Customs Service is "in charge" of the warehouse and all work performed there is under its "supervision." 19 U. S. C. § 1555.

[3] At the time in question, 19 U. S. C. § 1557(a) permitted the storage of imported goods for up to three years in a customs bonded warehouse without payment of an import duty. The importer was required to post a bond for the value of the duty. At the end of the three years, the goods could be withdrawn for domestic sale upon payment of the duty owed, or could be withdrawn for reexport without payment of any duty. In 1978, the time limit on the storage period was extended from three years to five years. Customs Procedural Reform and Simplification Act of 1978, Pub. L. 95–410, § 108(b)(1), 92 Stat. 892, 19 U. S. C. § 1557(a) (1976 ed., Supp. V).

[4] Houston assesses and collects taxes for itself and the Houston Independent School District.

[5] In 1976 and 1977, Xerox paid a total of approximately $1,817,000 in ad valorem taxes to appellees for copiers located in Texas for domestic use.

[6] Harris County assesses and collects taxes for itself, the State of Texas, and other local taxing authorities.

Declaratory and injunctive relief was sought in state court both from the taxes already assessed and such taxes as appellees might impose in the future. Xerox claimed that the taxes in question were unconstitutional because they violated the Import-Export Clause and the Commerce Clause of the Constitution. Art. I., § 10, cl. 2; Art. I, § 8, cl. 3. Appellees counterclaimed for the taxes assessed.

The trial court held that the taxes assessed by appellees violated both the Import-Export and Commerce Clauses, and it granted judgment to Xerox. The Texas Court of Civil Appeals, First District, reversed, holding that the taxes violated neither the Import-Export Clause nor the Commerce Clause. 619 S. W. 2d 402 (1981). Alternatively, it held that the trial court had violated Texas Rule of Civil Procedure 683 in granting injunctive relief. Finally, it granted judgment to appellees on their counterclaims in the amount of $131,311 plus penalties and interest to Harris County and $156,728 plus penalties and interest to the city of Houston. The Texas Supreme Court denied Xerox's application for a writ of error and this appeal followed. We noted probable jurisdiction, 456 U. S. 913 (1982), and we reverse.

## II

### A

A preliminary question is whether this Court has jurisdiction over the appeal. Appellees argue that this Court lacks jurisdiction since the decision of the Texas court reversing the grant of an injunction rested on an independent and adequate state ground. However, an indispensable predicate to an award of judgment to the appellees on their counterclaims was a determination that the taxes at issue were permissible under the United States Constitution; the Texas Court of Civil Appeals so held. It is not claimed that any independent and adequate state-law ground supports that holding. We therefore have jurisdiction to review that judgment. 28 U. S. C. § 1257(2).

## B

Pursuant to its powers under the Commerce Clause, Congress established a comprehensive customs system which includes provisions for Government-supervised bonded warehouses where imports may be stored duty free for prescribed periods. At any time during that period the goods may be withdrawn and reexported without payment of duty. Only if the goods are withdrawn for domestic sale or stored beyond the prescribed period does any duty become due. 19 U. S. C. § 1557(a) (1976 ed., Supp. V). While the goods are in bonded warehouses they are in the joint custody of the United States Customs Service and the warehouse proprietor and under the continuous control and supervision of the local customs officers. 19 U. S. C. § 1555. Detailed regulations control every aspect of the manner in which the warehouses are to be operated. 19 CFR §§ 19.1–19.6 (1982).

Government-regulated, bonded warehouses have been a link in the chain of foreign commerce since "a very early period in our history." *Fabbri* v. *Murphy*, 95 U. S. 191, 197 (1877). A forerunner of the present statute was the Warehousing Act of 1846, 9 Stat. 53. A major objective of the warehousing system was to allow importers to defer payment of duty until the goods entered the domestic market or were exported. The legislative history explains that Congress sought to reinstate

> "the sound though long neglected maxim of Adam Smith, 'That every tax ought to be levied at the time and in the manner most convenient for the contributor to pay it;' [by providing] that the tax shall only be paid when the imports are entered for consumption . . . ." H. R. Rep. No. 411, 29th Cong., 1st Sess., 3 (1846).

The Act stimulated foreign commerce by allowing goods in transit in foreign commerce to remain in secure storage, duty free, until they resumed their journey in export. The geographic location of the country made it a convenient place for

transshipment of goods within the Western Hemisphere and across both the Atlantic and the Pacific. A consequence of making the United States a center of world commerce was that

> "our carrying trade would be vastly increased; that shipbuilding would be stimulated; that many foreign markets would be supplied, wholly or in part, by us with merchandise now furnished from the warehouses of Europe; that the industry of our seaports would be put in greater activity; [and] that the commercial transactions of the country would be facilitated . . . ." Cong. Globe, 29th Cong., 1st Sess., App. 792 (1846) (remarks of Sen. Dix).

To these ends, Congress was willing to waive all duty on goods that were reexported from the warehouse, and to defer, for a prescribed period, the duty on goods destined for American consumption. This was no small sacrifice at a time when customs duties made up the greater part of federal revenues,[7] but its objective was to stimulate business for American industry and work for Americans.

In short, Congress created secure and duty-free enclaves under federal control in order to encourage merchants here and abroad to make use of American ports. The question is whether it would be compatible with the comprehensive scheme Congress enacted to effect these goals if the states were free to tax such goods while they were lodged temporarily in Government-regulated bonded storage in this country.

In *McGoldrick* v. *Gulf Oil Corp.*, 309 U. S. 414 (1940), the City of New York sought to impose a sales tax on imported petroleum that was refined into fuel oil in New York and sold as ships' stores to vessels bound abroad. The crude oil was

---

[7] In 1846, approximately 90% of all federal revenues were derived from customs duties. U. S. Bureau of Census, Historical Statistics of the United States, Colonial Times to 1970, Part 2, p. 1106 (Bicentennial ed. 1975) (customs accounted for $26,713,000 out of total federal revenues of $29,700,000).

imported under bond and refined in a customs bonded manufacturing warehouse and was free from all duties. We struck down the state tax, finding it pre-empted by the congressional scheme. *Id.*, at 429.

The Court determined that the purpose of the exemption from the tax normally laid upon importation of crude petroleum was "to encourage importation of the crude oil for [refinement into ships' stores] and thus to enable American refiners to meet foreign competition and to recover trade which had been lost by the imposition of the tax." *Id.*, at 427; see also *id.*, at 428. The Court went on to note that, in furtherance of this purpose,

> "Congress provided for the segregation of the imported merchandise from the mass of goods within the state, prescribed the procedure to insure its use for the intended purpose, and by reference confirmed and adopted customs regulations prescribing that the merchandise, while in bonded warehouse, should be free from state taxation." *Id.*, at 428–429.

The Court concluded that

> "the purpose of the Congressional regulation of the commerce would fail if the state were free at any stage of the transaction to impose a tax which would lessen the competitive advantage conferred on the importer by Congress, and which might equal or exceed the remitted import duty." *Id.*, at 429.

In so deciding, the Court expressly declined to rely on the customs regulation "prescribing the exemption from state taxation," holding that the regulation merely stated "what is implicit in the Congressional regulation of commerce presently involved." *Ibid.*[8]

---

[8] Here, a footnote in the regulations governing customs bonded warehouses specifically provided that "[i]mported goods in bonded warehouses are exempt from taxation or judicial process of any State or subdivision thereof." 19 CFR § 19.6(c), n. 11 (1982). A recent amendment to the regulations deleted this footnote on November 1, 1982, effective Decem-

The analysis in *McGoldrick* applies with full force here. First, Congress sought, in the statutory scheme reviewed in *McGoldrick*, to benefit American industry by remitting duties otherwise due. The import tax on crude oil was remitted to benefit oil refiners employing labor at refineries within the United States, whose products would not be sold in domestic commerce. Here, the remission of duties benefited those shippers using American ports as transshipment centers. Second, the system of customs regulation is as pervasive for the stored goods in the present case as it was in *McGoldrick* for the refined petroleum. In both cases, the imported goods were segregated in warehouses under continual federal custody and supervision. Finally, the state tax was large enough in each case to offset substantially the very benefits Congress intended to confer by remitting the duty.[9] In short, freedom from state taxation is as necessary to the congressional scheme here as it was in *McGoldrick*.

Although there are factual distinctions between this case and *McGoldrick*, they are distinctions without a legal difference. We can discern no relevance to the issue of congressional intent in the fact that the fuel oil in *McGoldrick* could be sold only as ships' stores whereas Xerox had the option to pay the duty and withdraw the copiers for domestic sale, or that in *McGoldrick* the city sought to impose a sales tax and here appellees assessed a property tax.

A similar conclusion was reached in *District of Columbia* v. *International Distributing Corp.*, 118 U. S. App. D. C. 71, 331 F. 2d 817 (1964). There, the Court of Appeals held that a wholesaler of imported alcoholic beverages was not liable

ber 1, 1982. 47 Fed. Reg. 49370. The Treasury Department offered no explanation for the amendment. The deletion of footnote 11 without explanation does not alter our conclusion that the ad valorem taxes here are pre-empted by the statutory scheme.

[9] The fair market value of the copiers located in the Houston warehouse on January 1, 1977, was $9,015,690. The duty remitted by the United States on these copiers amounted to $540,000. By comparison, the appellees here sought to impose taxes on the copiers for the year 1977 amounting to $211,112. App. 12a–15a, 25a.

for District of Columbia excise taxes on the sale of such beverages to foreign embassies while the beverages were stored in a customs bonded warehouse. The court reasoned that Congress intended to make customs bonded warehouses federal enclaves free of state taxation and that although the imported goods were physically within the District of Columbia, they were not subject to its taxing jurisdiction until they were removed from the warehouse. Since the sales took place prior to removal, the District could not tax those sales. The Court of Appeals quoted with approval the following language of the Tax Court:

> " 'The idea of bonded warehouses and their use by the United States custom authorities negatives the proposition that at the time of sale the alcoholic beverages were in the possession of the petitioner [the corporation]. True it is that the private bonded warehouse was physically in the District of Columbia; and the liquors were stored therein; and in that sense they were in the District. In law, however, they were still without that jurisdiction, and did not become subject thereto until they had been withdrawn from the private bonded warehouse and removed from the control of the customs official.' " *Id.*, at 73–74, 331 F. 2d, at 819–820.

*International Distributing Corp.* merely confirms what this Court said in 1877 in *Fabbri* v. *Murphy*, 95 U. S., at 197–198: "Congress did not regard the importation as complete while the goods remained in the custody of the proper officers of customs."

Accordingly, we hold that state property taxes on goods stored under bond in a customs warehouse are pre-empted by Congress' comprehensive regulation of customs duties.

## III

It is unnecessary for us to consider whether, absent congressional regulation, the taxes here would pass muster under the Import-Export Clause or the Commerce Clause.

The judgment of the Texas Court of Civil Appeals is reversed, and the case is remanded for proceedings not inconsistent with this opinion.

*Reversed and remanded.*

JUSTICE POWELL, dissenting.

Since 1799 the United States has permitted importers to post a customs bond in lieu of immediate payment of customs duties on imported goods. Today the Court holds that these goods stored in customs-bonded warehouses also are exempt from state property taxation. This holding would be unremarkable were it based on any evidence of congressional intent, but such support is lacking. The Court instead finds that state taxation is incompatible with the purposes of the federal customs-bonded warehousing system.

Customs-bonded storage enables importers to defer paying customs duties until the goods are ready for domestic sale or to avoid paying duties altogether if the goods are reexported. The Court correctly observes that Congress' ultimate purpose has been to encourage imports and enhance the position of the United States as a center of international trade. I am not persuaded, however, that nondiscriminatory state taxation of customs-bonded goods is incompatible with this purpose.

The Court attributes significance to the "pervasive" system of customs regulation of stored goods, *ante*, at 153, but fails to explain how this affects a State's power to tax. The purpose of the regulation is to guarantee the security of federal revenues. The owner of customs-bonded goods eventually must pay the customs duties or reexport the goods. The warehousing system enables the Federal Government to monitor the removal of bonded goods for sale or export and ensure that duties are paid when due. A State's imposition of an ad valorem tax does not impair this function. The "pervasive" regulation of the manner in which customs-bonded goods are stored and withdrawn, therefore, is simply immaterial to the validity of state taxation of those goods.

The Court also argues that state taxation of customs-bonded goods would frustrate the congressional purpose of encouraging foreign trade with the United States. It asserts that appellees' taxes are large enough "to offset substantially the very benefits Congress intended to confer by remitting the duty." *Ibid.* It seems to me that the word "offset" in this context is misused. If a State were to impose a *special* tax on property stored in customs-bonded warehouses, perhaps such a tax could be viewed as "offsetting" the benefits of storage. An importer deciding whether to use the warehouses would weigh the amount saved through remission of duties against the amount expended to pay the property tax. In this case, however, the county and city, acting pursuant to state law, impose the same ad valorem taxes no matter where the property is stored. An importer deciding whether to bring imported goods into Texas therefore knows that while the goods are in storage he will have to pay the property tax whether or not he uses a customs-bonded warehouse. The value to him of using customs-bonded storage is the full amount of the savings from deferral or avoidance of duties—precisely the benefit Congress expressly has provided in order to encourage merchants to bring business to the United States.

The Court accepts appellant's argument that a tax exemption for goods in customs-bonded warehouses reduces importers' costs and thereby furthers the federal interest in encouraging trade. But the Court itself acknowledges that state legislation should be pre-empted only where "necessary" to achieve a congressional purpose. *Ibid.* No showing has been made that this standard is met here. Duty-free storage and exemption from state property taxation are independent policies for promoting foreign trade. Congress quite reasonably may choose one policy, as it has done, without choosing the other.

The Court relies primarily on *McGoldrick* v. *Gulf Oil Corp.*, 309 U. S. 414 (1940), in which the Court invalidated a

city tax on the sale of fuel oil from a customs-bonded manufacturing warehouse to foreign-bound vessels. *McGoldrick* does not control this case. As the Court concedes, see *ante*, at 152, *McGoldrick* did not hold that the warehousing system and customs regulations alone mandated pre-emption of state taxation. Rather, a key factor was that Congress expressly had exempted from federal taxation the imported petroleum that was refined in the bonded warehouses for sale to foreign-bound vessels as ships' stores. The explicit congressional purpose "to enable American refiners to meet foreign competition," 309 U. S., at 427, provided a basis on which to infer congressional intent to pre-empt state taxation. There is no analogous federal tax exemption here, nor any evidence of congressional intent to encourage meeting of foreign competition. All that exists is the warehousing system itself, and for the reasons stated above I find this insufficient.

Nor do I find merit in appellant's constitutional arguments. Appellees' taxes do not violate the Commerce Clause, as they are "applied to an activity with a substantial nexus with the taxing State, [are] fairly apportioned, [do] not discriminate against interstate commerce, and [are] fairly related to the services provided by the State." *Complete Auto Transit, Inc.* v. *Brady*, 430 U. S. 274, 279 (1977). Nor do these non-discriminatory ad valorem taxes violate the Import-Export Clause, Art. I, § 10, cl. 2. See *Michelin Tire Corp.* v. *Wages*, 423 U. S. 276 (1976).

Appellant notes that *Michelin Tire* left open the possibility that even nondiscriminatory property taxes may not be imposed on goods that still are in transit. But appellant's copiers were stored for up to three years, and under current law they could have been stored for up to five years. 19 U. S. C. § 1557(a) (1976 ed., Supp. V). The only conceivable basis for the view that these goods remain "in transit" is that Congress has so provided. I cannot agree that Congress has endowed customs-bonded goods with indefinite immunity from nondiscriminatory state-authorized local property taxation.

During their prolonged period of storage, appellant's goods benefited from police and fire protection and the various other services provided by the county and city. "[T]he State is simply making the imported goods pay their own way, as opposed to exacting a fee merely for 'the privilege of moving through a State.'" *Washington Revenue Dept.* v. *Association of Washington Stevedoring Cos.*, 435 U. S. 734, 764 (1978) (POWELL, J., concurring in part and concurring in result) (quoting *Michelin Tire Corp.* v. *Wages, supra,* at 290). The Import-Export Clause never was intended to exempt imported goods in these circumstances.

I would affirm the judgment of the Texas Court of Civil Appeals.