**VONAGE HOLDINGS CORPORATION,**
Plaintiff,

v.

**THE MINNESOTA PUBLIC UTILI-TIES COMMISSION, and Leroy Koppendrayer, Gregory Scott, Phyllis Reha, and R. Marshall Johnson, in their official capacities as the commissioners of the Minnesota Public Utilities Commission and not as individuals, Defendants.**

No. CIV.03–5287 (MJD/JGL).

United States District Court,
D. Minnesota.

Oct. 16, 2003.

Ky E. Kirby, Russell M. Blau (pro hac vice), Swidler Berlin Shereff Friedman, LLP, Adam M. Nathe, Gray, Plant, Mooty, Mooty & Bennett, P.A., for Plaintiff.

Steven H. Alpert, Assistant Minnesota Attorney General, for Defendant.

## MEMORANDUM AND ORDER

DAVIS, District Court Judge.

### I. SUMMARY

This case illustrates the impact of emerging technologies evolving ahead of the regulatory scheme intended to address them. The issue before the Court is tied to the evolution of the Internet and the expansion of its capability to transmit voice communications. Despite its continued growth and development, the Internet remains in its infancy, and is an uncharted frontier with vast unknowns left to explore. Congress has expressed a clear intent to leave the Internet free from undue regulation so that this growth and exploration may continue. Congress also differentiated between "telecommunications services," which may be regulated, and "information services," which like the Internet, may not.

Plaintiff Vonage Holdings Corporation ("Vonage") provides a service that permits voice communications over the Internet. The Minnesota Public Utilities Commission ("MPUC") issued an order requiring Vonage to comply with Minnesota laws that regulate telephone companies. Vonage has asked this Court to enjoin the MPUC, arguing that it provides information services, and not telecommunications services.

The Court concludes that Vonage is an information service provider. In its role as an interpreter of legislative intent, the Court applies federal law demonstrating Congress's desire that information services such as those provided by Vonage must not be regulated by state law enforced by the MPUC. State regulation would effectively decimate Congress's mandate that the Internet remain unfettered by regulation. The Court therefore grants Vonage's request for injunctive relief.

### II. INTRODUCTION

This matter is before the Court on Vonage's motion for a preliminary injunction seeking to prevent enforcement of the MPUC's September 11, 2003 order. As detailed below, because the facts of this case are not in dispute, the Court will address Vonage's motion as one for a permanent injunction.

### III. FACTUAL BACKGROUND

Vonage markets and sells Vonage DigitalVoice, a service that permits voice communication via a high-speed ("broadband") Internet connection.[1] Vonage's service

---

1. In addition to broadband access via cable or DSL service, wireless broadband connections

uses a technology called Voice over Internet Protocol ("VoIP"), which allows customers to place and receive voice transmissions routed over the Internet.

Traditional telephone companies use circuit-switched technology. Chérie R. Kiser & Angela F. Collins, *Regulation On The Horizon: Are Regulators Poised To Address the Status of IP Telephony?*, 11 CommLaw Conspectus 19, 20–21 (2003). A person using a traditional telephone, or plain old telephone service ("POTS"), is connected to the public switched telephone network ("PSTN"), which is operated by local telephone companies. Voice communication using the Internet has been called Internet Protocol ("IP") telephony, and rather than using circuit switching, it utilizes "packet switching," a process of breaking down data into packets of digital bits and transmitting them over the Internet. *Id.* at 21.

Essential to using Vonage's services is that a third-party Internet service provider ("ISP"), provides a broadband Internet connection. Vonage does not function as an ISP for its customers. A Vonage customer may make and receive computer-to-computer calls. With another person connected to the PSTN, a Vonage customer may make computer-to-phone calls and receive phone-to-computer calls. During computer-to-computer calls, via a broadband Internet connection, an outgoing voice communication is converted into IP data packets which then travel the Internet to the person using a second computer.

For computer-to-phone calls and phone-to-computer calls, Vonage uses a computer to transform the IP data packets into a format compatible with the PSTN, and vice versa. Rather than using the POTS equipment, Vonage's customers use special customer premises equipment ("CPE") that enables voice communication over the Internet.

Vonage obtains ten-digit telephone numbers from telephone companies that it then uses to provide service to its customers. PSTN users may dial that ten-digit number and reach one of Vonage's customers. A telephone number associated with a Vonage customer is not associated with that customer's physical location. The number is instead associated with the customer's computer. Vonage's customers may use Vonage's services at any geographic location where they can access a broadband Internet connection. Thus, a customer could make and receive calls anywhere in the world where broadband access is available. Vonage is not capable of determining the geographic location from which its customers access its service.

Vonage has approximately 500 customers with billing addresses in Minnesota. It also has thirty-eight customers with Minnesota billing addresses who have requested telephone numbers with area codes not geographically situated within Minnesota, and eighty-eight customers with billing addresses outside of Minnesota who have requested telephone numbers geographically situated within Minnesota. Because Vonage is unable to determine the geographic location of its customers, it requires customers to register their location before they can dial "911" for public safety purposes.

The Minnesota Department of Commerce ("MDOC") investigated Vonage's services and on July 15, 2003, filed a complaint with the MPUC. The complaint alleged that Vonage failed to (1) obtain a

---

are becoming more widely available to consumers. *See* Yardena Arar, *DSL Speeds, Cellular Coverage,* PC World, Oct. 2003, at 30. The Court notes that such innovations may have unknown implications for communications as we now know them and the manner in which they are regulated.

proper certificate of authority required to provide telephone service in Minnesota; (2) submit a required 911 service plan; (3) pay 911 fees; and (4) file a tariff. MDOC also requested temporary relief; asserting that Vonage should be (1) prohibited from marketing to potential customers; (2) required to notify its Minnesota customers regarding the issues before the MPUC; and (3) required to submit a 911 plan. The MPUC denied the request for temporary relief.

Vonage then moved to dismiss the MDOC complaint. The MPUC issued a notice on August 1, 2003 stating that it would address two procedural matters at an August 13, 2003 meeting, but did not indicate that the MPUC would be hearing the merits of the case. Four days later, the MPUC changed course, and asked the parties to address the merits. Vonage and several other parties seeking to intervene or participate appeared for oral argument on August 13, 2003. At the hearing, Vonage's representative requested that a contested proceeding be held, so that facts could be developed. The MPUC declined this request. After issuing an oral decision on the hearing date, the MPUC issued a nine-page order on September 11, 2003 concluding that, within thirty days, Vonage was required to comply with Minnesota statutes and rules regarding the offering of telephone service. *See In the Matter of the Complaint of the Minnesota Department of Commerce Against Vonage Holding Corp Regarding Lack of Authority to Operate in Minnesota,* Docket No. P–6214/C–03–108 (Minn. Pub. Utils. Comm'n Sept. 11; 2003) (order finding jurisdiction and requiring compliance). Vonage then filed a complaint with this Court seeking a preliminary injunction.

## IV. DISCUSSION

When deciding a motion for a preliminary injunction, the Court should consider: (1) the moving party's probabili-

ty of success on the merits; (2) the threat of irreparable harm to the moving party; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) the public interest in the issuance of the injunction. *Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109, 114 (8th Cir.1981) (en banc). "None of these factors by itself is determinative; rather, in each case the four factors must be balanced to determine whether they tilt toward or away from granting a preliminary injunction." *West Publishing Co. v. Mead Data Central, Inc.,* 799 F.2d 1219, 1222 (8th Cir.1986) (citing *Dataphase,* 640 F.2d at 113). The party requesting injunctive relief bears the "complete burden" of proving all the factors. *Gelco Corp. v. Coniston Partners,* 811 F.2d 414, 418 (8th Cir.1987). Where the parties only disagree on questions of law, a motion for a preliminary injunction may be considered as one for a permanent injunction. *See Bank One v. Guttau,* 190 F.3d 844, 847 (8th Cir.1999) (reviewing preliminary injunction as permanent injunction where only issues were questions of law). The parties do not dispute fact issues, and thus the Court will consider Vonage's motion as one for a permanent injunction. The standard is the same for a permanent injunction except that the movant must show actual success on the merits. *Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 1404, 94 L.Ed.2d 542 (1987).

### A. Success on the Merits

The issue before the Court is whether Vonage may be regulated under Minnesota law that requires telephone companies to obtain certification authorizing them to provide telephone service. *See* Minn.Stat. § 237.16, subd. 1(b) (providing that in order to obtain certificate, person must possess "the technical, managerial, and financial resources to provide the proposed

telephone services"); *see also* Minn.Stat. § 237.74, subd. 12 (requiring certificate of territorial authority); Minn. R. 7812.0200, subp. 1 (requiring certificate). Vonage asserts that the Communications Act of 1934, as amended by the Communications Act of 1996, 47 U.S.C. §§ 151–615 ("the Communications Act") pre-empts the state authority upon which the MPUC's order relies. In addition to other arguments supporting pre-emption, Vonage asserts that because its services are "information services," which are not subject to regulation, rather than "telecommunications services," which may be regulated. Vonage further argues that the MPUC's order is unconstitutional because it violates the Commerce Clause and the Due Process Clause.

■ The Supremacy Clause of Art. VI of the Constitution empowers Congress to pre-empt state law. *Louisiana Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 368, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986). Pre-emption occurs when (1) Congress enacts a federal statute that expresses its clear intent to pre-empt state law; (2) there is a conflict between federal and state law; (3) "compliance with both federal and state law is in effect physically impossible;" (4) federal law contains an implicit barrier to state regulation; (5) comprehensive congressional legislation occupies the entire field of regulation; or (6) state law is an obstacle to the "accomplishment and execution of the full objectives of Congress." *Louisiana PSC,* 476 U.S. at 368–69, 106 S.Ct. at 1898. Moreover, "a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation." *Id.* at 369, 106 S.Ct. at 1898–99.

At the outset, the Court must note that the backbone of Vonage's service is the Internet. Congress has spoken with unmistakable clarity on the issue of regulating the Internet: "It is the policy of the United States … to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation." 47 U.S.C. § 230(b); *see also Southwestern Bell Tel. Co. v. FCC,* 153 F.3d 523, 544 (8th Cir. 1998) (concluding that, based on Congress's intent to leave Internet unregulated, ISPs should be excluded from the imposition of interstate access charges); *Zeran v. America Online, Inc.,* 129 F.3d 327, 330 (4th Cir.1997) (recognizing that "Congress acted to keep government regulation of the Internet to a minimum").

In addressing the parties' arguments, the Court must also examine the recent history of the regulatory scheme governing the telecommunications industry. The growing capability of the computer and its interaction with telecommunications technology presented challenges acknowledged by the Federal Communications Commission ("FCC") over twenty years ago. In 1980, recognizing the computer's involvement with telecommunications, the FCC distinguished between "basic services" and "enhanced services." *See In the Matter of Amendment of Section 64.702 of the Commission's Rules and Regulations (Second Computer Inquiry),* 77 FCC 2d 384, ¶ 5 (1980) (Final Decision) ("Second Computer Inquiry").[2] After making this distinction,

---

**2.** The FCC stated:

> [W]e adopt a regulatory scheme that distinguishes between the common carrier offering of basic transmission services and the offering of enhanced services … We find that basic service is limited to the common carrier offering of transmission capacity for the movement of information, whereas enhanced service combines basic service with

computer processing applications that act on the format, content, code, protocol or similar aspects of the subscriber's transmitted information, or provide the subscriber additional, different, or restructured information, or involve subscriber interaction with stored information.

Second Computer Inquiry ¶ 5.

the FCC noted that basic services offered by a common carrier would continue to be regulated by Title II of the Communications Act, but that

> regulation of enhanced services is not required in furtherance of some overall statutory objective. In fact, the absence of traditional public utility regulation of enhanced services offers the greatest potential for efficient utilization and full exploitation of the interstate telecommunications network.

*Id.* ¶ 7, at 387.[3]

The line demarcating basic services from enhanced services became more defined when, in passing the Communications Act of 1996, Congress defined the terms "telecommunications,"[4] "telecommunications services"[5] and "information services."[6] *See* 47 U.S.C. § 153.

■ In a report to Congress regarding universal service that addressed many of the issues before the Court in this matter, the FCC explained that the new terms it adopted to describe different types of communications services were comparable to the old. *In re Federal–State Joint Board on Universal Service,* 13 FCC Rcd. ¶ 21, at 11511 (April 10, 1998) (Report to Congress) ("*Universal Service Report*").[7] The court has examined both the legislative history of the Communications Act of 1996 and the *Universal Service Report,* and agrees with the FCC's interpretation of congressional intent. The *Universal Service Report* provided enhanced clarity with regard to the distinction between traditional telephone services offered by common carriers, and the continuously growing universe of information services. It also solidified and added a supportive layer to the historical architecture of the as yet largely unregulated universe of information services. The FCC noted the "intention of the drafters of both the House and Senate bills that the two categories be separate and distinct, and that information service providers not be subject to tele-

---

**3.** Later, as the FCC went further to protect enhanced services from regulation it discussed a theory of "contamination" whereby "[t]he enhanced component of [service providers'] offerings 'contaminates' the basic component, and the entire offering is therefore considered to be enhanced." *In re Amendment to Sections 64.702 of the Commission's Rules and Regulations* (Third Computer Inquiry), 3 FCC Rcd. 11501, 1170 n. 23 (1988).

**4.** "The term 'telecommunications' means the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." 47 U.S.C. § 153(43).

**5.** "Telecommunications service" is "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used." 47 U.S.C. § 153(46).

**6.** "Information service" is defined as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service." 47 U.S.C. § 153(20).

**7.** "Specifically, we find that Congress intended the categories of 'telecommunications service' and 'information service' to parallel the definitions of 'basic service' and 'enhanced service.'" *In re Federal–State Joint Board on Universal Service,* 13 FCC Rcd. ¶ 21, at 11511 (April 10, 1998) (Report to Congress) ("*Universal Service Report*"). Further, the FCC found that "[t]he language and legislative history of both the House and Senate bills [which became the Communications Act of 1996] indicate that the drafters of each bill regarded telecommunications services and information services as mutually exclusive categories." *Id.* ¶ 43, at 11521–22.

communications regulation." *Id.* ¶ 43, at 11523. In addition to the positions taken by the FCC, Congress has expressly stated that enhanced services [8] are not to be regulated under Title II of the Telecommunications Act. 47 C.F.R. § 64.702(a).

■ Examining the statutory language of the Communications Act, the Court concludes that the VoIP service provided by Vonage constitutes an information service because it offers the "capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications." 47 U.S.C. § 153(20). The process of transmitting customer calls over the Internet requires Vonage to "act on" the format and protocol of the information. 47 C.F.R. § 64.702(a). For calls originating with one of Vonage's customers, calls in the VoIP format must be transformed into the format of the PSTN before a POTS user can receive the call. For calls originating from a POTS user, the process of acting on the format and protocol is reversed. The Court concludes that Vonage's activities fit within the definition of information services. Vonage's services are closely tied to the provision of telecommunications services as defined by Congress, the courts and the FCC, but this Court finds that Vonage *uses* telecommunications services, rather than provides them.

Looking beyond the plain statutory language, the Court also examines the nature of IP telephony, a subject that by its very nature calls into question the telecommunications services/information services distinction adopted by the 1996 Communications Act.[9] At issue is whether Vonage's IP telephony service constitutes a telecommunications service or an information service.

In the *Universal Service Report,* the FCC examined two types of IP telephony: phone-to-phone and computer-to-computer. The FCC refrained from explicitly classifying either type as a telecommunications service or an information service.[10] The FCC tentatively concluded that phone-to-phone IP telephony "lacks the characteristics that would render them 'information services' within the meaning of the statute, and instead bear the characteristics of 'telecommunications services." *Universal Service Report,* 13 FCC Rcd. ¶ 89, at 11544. The FCC devised a set of conditions used to determine whether a provider's offering constituted phone-to-phone IP telephony.

> In using the term 'phone-to-phone' IP telephony; we tentatively intend to refer to services in which the provider meets the following conditions: (1) it holds itself out as providing voice telephony or facsimile transmission service; (2) it does not require the customer to use CPE different from that CPE necessary

---

**8.** Enhanced services are defined as "services, offered over common carrier transmission facilities used in interstate communications, which employ computer processing applications that act on the format, content, code, protocol or similar aspects of the subscriber's transmitted information." 47 C.F.R. § 64.702(a); *Universal Service Report,* 13 FCC Rcd. ¶ 21, at 11511 (stating that the definition for enhanced services parallels the definition of information services).

**9.** There are three types of IP telephony: computer-to-computer telephony, telephone-to-

computer telephony, and telephone-to-telephone telephony. Kiser & Collins, *supra,* at 21. Vonage's services encompass only the first two.

**10.** The FCC concluded that with regard to phone-to-phone IP telephony it was not "appropriate to make any definitive pronouncements in the absence of a more complete record focused on individual service offerings." *Universal Service Report,* 13 FCC Rcd. ¶ 3, at 11503.

to place an ordinary touch-tone call (or facsimile transmission) over the public switched telephone network; (3) it allows the customer to call telephone numbers assigned in accordance with the North American Numbering Plan, and associated international agreements; and (4) it transmits customer information without net change in form or content.

*Id.* ¶ 88, at 11543–44.

In applying the FCC's four phone-to-phone IP telephony conditions to Vonage, it is clear that Vonage does not provide phone-to-phone IP telephony service. Vonage's services do not meet the second and fourth requirements. Use of Vonage's service requires CPE different than what a person connected to the PSTN uses to make a touch-tone call. Further, a net change in form and content occurs when Vonage's customers place a call. If the end user is connected to the PSTN, the information transmitted over the Internet is converted from IP into a format compatible with the PSTN. Vonage's service is not a telecommunications service because "from the user's standpoint" the form of a transmission undergoes a "net change." *Id.* ¶ 89, at 11544.

With regard to computer-to-computer IP telephony, the FCC declined to decide whether " 'telecommunications' is taking place in the transmission of computer-to-computer IP telephony." *Id.* ¶ 87, at 11543. When Vonage's users communicate with other customers in computer-to-computer IP telephony, the two customers are again using the Internet to transmit data packets which, by their very nature change form and do not come in contact with the regulated PSTN. Vonage's service effectively carves out a role in the communications scheme that distinguishes it from telecommunications services.

In addition to a generic analysis of the varying forms of IP telephony, the FCC examined whether three classes of providers that facilitate IP telephony provide telecommunications services. First, the FCC stated that "[c]ompanies that only provide software and hardware installed at customer premises do not fall within [the telecommunications provider] category, because they do not transmit information." *Id.* ¶ 86, at 11543. Second, it concluded that ISPs did "not appear to be 'provid[ing]' telecommunications to its subscribers." *Id.* ¶ 87, at 11543 (alteration in original) (quotation omitted).

Third, it addressed the role of "an IP telephony service provider [that] deploys a gateway within the network to enable phone-to-phone service." "[G]ateways" are "computers that transform the circuit-switched voice signal into IP packets, and vice versa, and perform associated [signaling], control, and address translation functions." *Id.* ¶ 84, at 11541. The FCC concluded that such services possessed "the characteristics of 'telecommunications services.' " *Id.* ¶ 89, at 11544. The FCC's conclusion focused on gateway providers that provide phone-to-phone IP telephony services. The FCC noted that from a "functional standpoint," the users were only receiving voice transmission, and not information services. *Id.* In other words, because a person using a POTS telephone was on either end of the call, even if the call was routed over the Internet, there was no form change sufficient to constitute information services.

Vonage is unlike the first two classes of providers discussed by the FCC; it does more than merely provide software and hardware, and is not an ISP. Vonage does, however, provide gateways that translate IP format into a format compatible with the PSTN. Because Vonage never provides phone-to-phone IP telephony (it only provides computer-to-phone or phone-to-computer IP telephony), from a "functional standpoint," Vonage's service is distin-

guishable from the scenario the FCC considered to be telecommunications services.

The FCC was aware of the relationship that information services providers often have with providers of telecommunications services, but recognized that the two should remain distinguishable. "[W]hen an entity offers transmission incorporating the 'capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information,' it does not offer telecommunications. Rather, it offers an 'information service' *even though it uses telecommunications to do so. Id.* ¶ 39, at 11520 (emphasis added). Further, the FCC recognized that the architecture of information services would be built on top of existing telecommunications services infrastructure, but, in terms of regulation, would still remain separate for strong policy purposes.

> *The Internet and other enhanced services have been able to grow rapidly in part because the Commission concluded that enhanced service providers were not common carriers within the meaning of the Act.* This policy of distinguishing competitive technologies from regulated services not yet subject to full competition remains viable. Communications networks function as overlapping layers, with multiple providers often leveraging a common infrastructure. As long as the underlying market for provision of transmission facilities is competitive or is subject to sufficient pro-competitive safeguards, *we see no need to regulate the enhanced functionalities that can be built on top of those facilities.* We believe that Congress, by distinguishing 'telecommunications service' from 'information service,' and by stating a policy goal of preventing the Internet from being fettered by state or federal regulation, endorsed this general approach. *Limiting carrier regulation to those companies that provide the underlying transport ensures that regula-*

> *tion is minimized and is targeted to markets where full competition has not emerged.* As an empirical matter, the level of competition, innovation, investment, and growth in the enhanced services industry over the past two decades provides a strong endorsement for such an approach.

*Id.* ¶ 95, 11546 (emphasis added) (footnotes omitted). "Congress intended to maintain a regime in which information service providers are not subject to regulation as common carriers merely because they provide their services 'via telecommunications.'" *Id.* ¶ 21, at 11511. The Court acknowledges the attractiveness of the MPUC's simplistic "quacks like a duck" argument, essentially holding that because Vonage's customers make phone calls, Vonage's services must be telecommunications services. However, this simplifies the issue to the detriment of an accurate understanding of this complex question. The Court must follow the statutory intent expressed by Congress, and interpreted by the FCC. Short of explicit statutory language, the Court can find no stronger guidance for determining that Vonage's service is an information service, as defined by Congress and interpreted by the FCC.

Having determined that Vonage's services constitute information services, the Court next examines Congress's intent with regard to state regulation of information services, to determine whether the MPUC's order is pre-empted. By clearly separating information services from telecommunications services, the Court finds ample support for the proposition that Congress intended to keep the Internet and information services unregulated.

Because Congress has expressed an intent that services like Vonage's must remain unregulated by the Communications Act, and because the MPUC has exercised state authority to regulate Vonage's ser-

vice, the Court concludes that that state and federal laws conflict, and pre-emption is necessary. *Louisiana PSC,* 476 U.S. at 368, 106 S.Ct. at 1898.

■ Where federal policy is to encourage certain conduct, state law discouraging that conduct must be pre-empted. *See Xerox Corp. v. County of Harris,* 459 U.S. 145, 151–53, 103 S.Ct. 523, 527–29, 74 L.Ed.2d 323 (1982) (holding state tax could not be imposed on Mexican-manufactured goods shipped to the United states where Congress clearly intended to create a duty-free enclave to encourage merchants to use American ports); *see also* 1 Laurence H. Tribe, *American Constitutional Law* § 6–29, at 1181–82 (3d ed.2000) ("state action must ordinarily be invalidated if its manifest effect is to penalize or discourage conduct that federal law specifically seeks to encourage").

In the *Universal Service Report,* the FCC explained that policy considerations required keeping the definition of telecommunications services distinct from information services so that information services would be open to healthy competition. Its discussion demonstrates the FCC's reluctance to permit state regulation of information services providers, foreshadowing the very issue before the Court today:

> An approach in which a broad range of information service providers are simultaneously classed as telecommunications carriers, and thus presumptively subject to the broad range of Title II constraints, could seriously curtail the regulatory freedom that the Commission concluded in Computer II was important to the healthy and competitive development of the enhanced-services industry.... The classification of information service providers as telecommunications carriers, moreover, could encourage states to impose common-carrier regulation on such providers.... State require-

ments for telecommunications carriers vary from jurisdiction to jurisdiction, but include certification, tariff filing, and various reporting requirements and fees.

*Universal Service Report,* 13 FCC Rcd. ¶ 46, at 11524. The Court thus concludes that Minnesota regulations that have the effect of regulating information services are in conflict with federal law and must be pre-empted.

The MPUC argues that the true issue in this case is whether it is possible to comply with both federal and state laws. According to the MPUC, there is no conflict between state and federal law, and compliance with both is possible. The MPUC further asserts that the FCC has not yet exercised its authority to regulate VoIP services, and has not prevented the states from doing so. The Court respectfully disagrees. VoIP services necessarily are information services, and state regulation over VoIP services is not permissible because of the recognizable congressional intent to leave the Internet and information services largely unregulated.

The Court also concludes that Congress's expression of its intent to not have Title II apply to enhanced services demonstrates its intent to occupy the field of regulation of information services. 47 C.F.R. § 64.702(a); *Louisiana PSC,* 476 U.S. at 368, 106 S.Ct. at 1898 (providing for pre-emption where comprehensive congressional legislation occupies the entire field of regulation).

> [I]n very narrow circumstances, when the federal government has withdrawn from a field and indicated an intent to ensure that a vacuum be left behind, at least some state laws—even if generally applicable and seemingly unrelated to the vacated field—might become unenforceable. Still, the supposed preemptive effects of *de* regulation remain a matter of congressional intent to contin-

ue to occupy the field, but to do so with a vacuum.

Tribe, *supra* § 6–31, at 1207 (emphasis original).

> We believe that Congress, by distinguishing 'telecommunications service' from 'information service,' and by stating a policy goal of preventing the Internet from being fettered by state or federal regulation, endorsed this general approach. Limiting carrier regulation to those companies that provide the underlying transport ensures that regulation is minimized and is targeted to markets where full competition has not emerged.

*Universal Service Report,* 13 FCC Rcd. ¶ 95, at 11546 (footnote omitted). Considering this expression of congressional intent, the MPUC's order would be an obstacle to the "accomplishment and execution of the full objectives of Congress." *Louisiana PSC,* 476 U.S. at 368–69, 106 S.Ct. at 1898. The Court understands the MPUC's position, but that position will have the unintended consequence of retarding the expansion of the Internet.

To summarize, it is clear that Congress has distinguished telecommunications services from information services. The purpose of Title II is to regulate telecommunications services, and Congress has clearly stated that it does not intend to regulate the Internet and information services. Vonage's services do not constitute a telecommunications service. It only uses telecommunications, and does not provide them. The Court can find no statutory intent to regulate VoIP, and until Congress speaks more clearly on this issue, Minnesota may not regulate an information services provider such as Vonage as if it were a telecommunications provider. What Vonage provides is essentially the enhanced functionality on top of the underlying network, which the FCC has explained should be left alone. *Universal*

*Service Report,* 13 FCC Rcd. ¶ 95, at 11546.

Because the Court concludes that the MPUC's order is pre-empted for the previously-stated reasons, it need not reach Vonage's remaining arguments regarding pre-emption, or its Commerce Clause and Due Process arguments. Accordingly, the Court concludes that Vonage's argument that the MPUC's order is pre-empted will succeed on the merits.

### B. Irreparable Harm

Vonage contends that the MPUC's order will cause it irreparable harm because it will be forced to stop serving customers in Minnesota and stop soliciting new business. Vonage claims that even a brief shutdown of its service to Minnesota customers could prevent it from staying the leader of its business niche, and damage its reputation and goodwill. Loss of intangible assets such as reputation and goodwill can constitute irreparable injury. *See General Mills, Inc. v. Kellogg Co.,* 824 F.2d 622, 625 (8th Cir.1987). The Court finds that enforcing the MPUC order will result in irreparable harm to Vonage.

### C. Balance of Harms

According to Vonage, with approximately 500 customers with Minnesota billing addresses, continuing to service those customers cannot create any harm to the health and safety of Minnesota consumers. The Court concludes that permitting Vonage to continue operations in Minnesota and solicit new customers poses little risk of harm to the interests the MPUC represents. Enforcing the MPUC's order, however, would pose a disproportionate harm upon Vonage. The balance of harms weighs in favor of Vonage.

### D. Public interest

Vonage contends that it is in the public's interest that a preliminary/permanent

injunction be granted, because customers can benefit from its product. Defendants respond that Vonage's failure to comply with the 911 plan is not in the public's interest, and that other companies who do comply with Minnesota law are at a competitive disadvantage. The Court concludes that based on the previously-discussed congressional intent to leave Internet and information services unregulated, granting an injunction is in the public interest.

Having satisfied the *Dataphase* elements, the court concludes that a permanent injunction preventing enforcement of the MPUC's September 11, 2003 order is proper.

Accordingly, based on all the files, records and proceedings herein, IT IS HEREBY ORDERED that Vonage's motion for preliminary injunction, which the Court considers a motion for permanent injunction is GRANTED.