**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellant,*

INTRIGUE TRADING, INC.,
            *Claimant-Appellee,*

            v.

4,432 MASTERCASES OF CIGARETTES,
More or Less,
            *Defendant.*

No. 04-55354

D.C. No.
CV-01-10113-FMC

---

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

INTRIGUE TRADING, INC.,
            *Claimant-Appellant,*

            v.

4,432 MASTERCASES OF CIGARETTES,
More or Less,
            *Defendant.*

No. 04-55356

D.C. No.
CV-01-10113-FMC

---

UNITED STATES OF AMERICA,
            *Plaintiff-Appellant,*

INTRIGUE TRADING, INC.,
            *Claimant-Appellee,*

            v.

4,432 MASTERCASES OF CIGARETTES,
More or Less,
            *Defendant.*

No. 04-56350

D.C. No.
CV-01-10113-FMC

OPINION

6015

Appeal from the United States District Court
for the Central District of California
Florence Marie Cooper, District Judge, Presiding

Argued and Submitted
November 16, 2005—Pasadena, California

Filed June 2, 2006

Before: Procter Hug, Jr. and Kim McLane Wardlaw,
Circuit Judges, and James K. Singleton,* District Judge.

Opinion by Judge Wardlaw

---

*The Honorable James K. Singleton, Senior United States District
Judge for the District of Alaska, sitting by designation.

**COUNSEL**

Brian M. Hoffstadt, Assistant United States Attorney, and Pio S. Kim, Assistant United States Attorney, Los Angeles, California, argued the case and were on the briefs for the appellants/cross-appellees.

Eric Honig, Law Office of Eric Honig, Marina del Rey, California, argued the case and was on the briefs for the appellees/cross-appellants.

Dennis Eckhart and Peter M. Williams, Office of the Attorney General, were on the briefs for amicus curiae California Board of Equalization.

**OPINION**

WARDLAW, Circuit Judge:

This appeal and cross-appeal arise from the search and seizure by the United States Customs Service of over 44 million cigarettes, contained in 4,432 mastercases, for nonpayment of California cigarette taxes. The appeals require us to determine

the extent of immunity from state and federal regulatory and taxing power that businesses can expect when they operate in foreign trade zones. We hold that an importer of goods destined for domestic consumption is not exempt from state excise taxes and administrative searches by federal Customs officials simply because it stores its merchandise in a foreign trade zone.

## I.   FACTS AND PROCEDURAL HISTORY

Between 1998 and 2000, Intrigue Trading, Inc. ("Intrigue"), a California corporation, was licensed by the Bureau of Alcohol, Tobacco, and Firearms to import gray market cigarettes into the United States for domestic sale. The term "gray market cigarettes" refers to both American-made exported cigarettes that are re-imported into the United States, as well as American brands of cigarettes manufactured abroad for sale in foreign markets but then imported into the United States.[1] Until the year 2000, importing gray market cigarettes was legal, as was their sale in California. *See* Tariff Suspension and Trade Act of 2000, Pub. L. No. 106-476, tit. IV, § 4002 (effective as amended Nov. 9, 2000, at 26 U.S.C. § 5754) (banning importation of previously exported tobacco products); Act of May 5, 2000, S.B. 1038, § 1, Cal. Legis. Serv. 18 (codified as amended at Cal. Rev. & Tax. Code § 30163) (making illegal in California the importation of cigarettes in violation of 26 U.S.C. § 5754, and the importation by third parties of American-branded cigarettes manufactured abroad). Throughout most of the period of Intrigue's operations, however, California law required cigarette distributors either to obtain a state distributor's license or to pay use taxes on cigarettes placed into storage.

---

[1]Collier, Shannon, Rill & Scott, PLLC, Memorandum to NACS, *Questions and Answers Relating to Gray Market Cigarettes* (Sept. 10, 1999), *available at* http://www.nacsonline.com/NACS/Resource/Government/ gray_market_cigs_091099.htm.

Intrigue is ninety percent owned by Andy Lee, who is also the majority shareholder of two other corporations that dealt in gray market cigarettes, National Trade Industry, Inc. ("NTI") and Ampac, Inc. ("Ampac"). The companies were similarly structured and shared storage facilities, but each company served a particular purpose. For instance, only NTI was licensed to sell cigarettes in California. The companies are separately incorporated.

Between 1998 and April 2001, Intrigue regularly stored gray market cigarettes, including the 4,432 mastercases at issue here, in a storage space rented under Ampac's name at the Port Services Foreign Trade Zone in Carson, California. Foreign trade zones ("FTZs") are discrete areas located adjacent to ports of entry and authorized by Congress to receive preferential treatment under United States customs laws. *BMW Mfg. Corp. v. United States*, 241 F.3d 1357, 1359 n.1 (Fed. Cir. 2001). Merchandise from foreign countries stored within an FTZ is not subject to United States customs duties so long as it remains in the FTZ. 19 U.S.C. § 81c. Congress thus allows international shippers to use American ports as a duty-free way station in international commerce. Companies operating within FTZs are also permitted to manipulate or alter these foreign goods (by repackaging, breaking up, assembling, sorting, mixing with other foreign or domestic parts, etc.) before reshipment abroad, without incurring Customs duties unless they are entered into the United States for sale. *Id.* In addition, domestic merchants may use FTZs as a holding area for eventual exports, or to store "domestic status" merchandise, imported goods on which Customs duties have already been paid. *See* 19 C.F.R. §§ 146.43; 146.44. Intrigue's mastercases of cigarettes were "domestic status" goods.[2]

---

[2]More information on the establishment and regulation of FTZs can be found at United States Customs & Border Protection, Foreign Trade Zones Manual, http://www.cbp.gov/xp/cgov/toolbox/publications/manuals_handbooks/, and United States Customs & Border Protection, About Foreign-Trade Zones & Contact Info, http://www.cbp.gov/xp/cgov/import/cargo_contr ol/ftz/about_ftz.xml.

Intrigue purchased the 4,432 mastercases of Marlboro brand cigarettes between August 2000 and January 2001 from three different companies that had imported them through Miami, Florida. Importation documents indicated that the cigarettes were manufactured in Switzerland. They had passed through Customs and all duties were paid. From Miami, Intrigue shipped the cigarettes to the Carson Port Services FTZ in California, where they were placed in storage for a planned eventual sale to LPC, Inc., a Missouri-based company doing business under the name DirtCheapCigarettes-.com. This transaction never occurred because the United States Customs Service seized the cigarettes.

Customs Service agents began searching FTZs in the Los Angeles and Long Beach area in early April 2001 as part of an investigation into counterfeit and contraband cigarettes they suspected were being stored there. Customs Inspector Rudolfo Villacana visited the Carson FTZ on April 3 or 4, 2001, but was informed by Zone Operator John Yeskel that there were no cigarettes on-site. A day or two later, additional Customs Service agents visited the Carson FTZ and a different zone employee, in response to the agents' questioning, led them to Intrigue's space. There, they found a fenced-in, locked storage area covered with black tarp that obscured the contents of the pallets. Zone employees did not have a key to the storage space, nor could they locate documents detailing Intrigue's admissions and removals of cigarettes from the FTZ. When the Customs inspectors threatened to cut the lock, an Intrigue employee, Nick Choi, was summoned. He had a key to the space and opened it for the inspectors to enter. During this initial search, the inspectors found mastercases of cigarettes wrapped in opaque black plastic. This combination of circumstances made one senior Customs inspector "very suspicious" of the nature of the cigarettes.

Customs Service officials returned to the FTZ again on April 5 and seized twelve sample cartons of cigarettes for testing. The next day, April 6, four officials at a Customs ware-

house performed a series of field tests on the cigarettes. Those tests indicated that the cigarettes were "likely counterfeit," "possibly counterfeit," or at least "appeared to be counterfeit." Based on the field test results and the suspicious circumstances of the cigarettes' storage, the Customs Service decided to seize all the cigarettes in Intrigue's storage area and move them to a secure Customs warehouse.

The following Monday, April 9, 2001, Customs Specialist Trevor Rudalevige performed another test on packs of cigarettes from the sample cartons. The results of this second test (the "Rudalevige test") were inconclusive. Officer Rudalevige recommended forwarding some of the samples to Phillip Morris for further analysis. That same day, Customs officials began a detailed, week-long inventory of the cigarettes. On April 10, in the course of the inventory, agents found two boxes of cigarettes that bore Customs notations indicating that they had previously been denied importation into the United States. Sometime between April 10 and April 17, Customs officials also discovered evidence of country-of-origin violations: some of the inventoried cigarettes were not from Switzerland, as Intrigue had claimed, but rather from the Czech Republic, Germany, Holland, and Malaysia.

Phillip Morris responded to the Customs Service's inquiry on April 19. Its tests established that the cigarettes in fact were not counterfeit, but it confirmed that three of the four cartons it reviewed were incorrectly labeled as manufactured in Switzerland. The Customs Service retained control of the cigarettes, asserting that it now had probable cause to believe that a large number of the cigarettes were imported in violation of country-of-origin rules or imported despite having been previously denied entry. All but 408 mastercases ultimately were sold at a court-ordered interlocutory sale in October 2002 for $450,000. The estimated domestic market value of the 4,432 mastercases of cigarettes was between $1.7 million and $5.5 million.

In December 2001, the United States filed this civil forfeiture complaint against the cigarettes as goods entered into the country in violation of law. *See* 19 U.S.C. § 1595a. The United States initially alleged only country-of-origin and unlawful importation violations but amended its complaint in December 2002 to add charges under the Contraband Cigarette Trafficking Act ("CCTA"), 18 U.S.C. § 2341 *et seq.* The CCTA claim alleged that the cigarettes could be seized because they were "found" in California without bearing "evidence of the payment of applicable State cigarette taxes." 18 U.S.C. §§ 2341, 2344.

Intrigue moved to suppress the cigarettes as fruits of an illegal search and seizure in violation of the Fourth Amendment. The district court denied the suppression motion, holding that "there is no legitimate expectation of privacy in imported merchandise located in [an FTZ]," and that "imports released from Customs' custody may still be subject to Customs sampling or additional examination after they are released."

After the government withdrew five of its eight original claims, the parties filed cross-motions for summary judgment. The district court denied summary judgment to Intrigue on the country-of-origin and unlawful importation claims but granted summary judgment in its favor on the CCTA claim. The district court held that California cigarette taxes were not due on Intrigue's mastercases because such taxes are preempted by a provision of the Foreign Trade Zones Act ("FTZ Act") that prohibits the imposition of state and local ad valorem taxes against goods stored in FTZs. *See* 19 U.S.C. § 81o(e). It concluded that California's imposition of a tax on cigarettes destined for sale in another state "transform[s] a tax on the sale or distribution of cigarettes in California into an ad valorem property tax."

The parties entered into a consent judgment in December 2003. In return for the government's agreement to drop its remaining country-of-origin claims, Intrigue agreed that the

government preserved its right to appeal the CCTA judgment. In turn, Intrigue preserved its right to appeal the denial of its motion to suppress. Thereafter, the district court awarded Intrigue $491,000 in attorney fees. The government appeals that award, arguing only that if we reverse the grant of summary judgment on the CCTA claim, Intrigue will not be a "prevailing party" and the fee award should be vacated. We consolidated these timely appeals.

## II.   MOTION TO SUPPRESS

We review the denial of a motion to suppress de novo, *see United States v. Willis*, 431 F.3d 709, 713 n.3 (9th Cir. 2005), although we accept the district court's underlying findings of fact in the absence of clear error, *see id*. We hold that the district court properly denied Intrigue's motion to suppress the 4,432 mastercases of cigarettes as fruits of an illegal search and seizure.

Intrigue argues that the warrantless search of its locked cage and sealed cigarette cases on April 4 or 5, 2001, and the related seizure of twelve sample cartons of cigarettes for testing, violated the Fourth Amendment. It further contends that the United States lacked probable cause when it seized all 4,432 mastercases of cigarettes on April 6. Lastly, Intrigue contends that the government's continuing retention of the mastercases after the inconclusive Rudalevige test on April 9 was unconstitutional, because any probable cause that may have arisen at earlier points in the Customs Service investigation dissipated at the conclusion of the second, inconclusive test.

### A.   Initial Search

It is undisputed that Customs agents searched Intrigue's storage area within the Port Services FTZ and seized twelve sample cartons of cigarettes without a warrant. We conclude,

however, that this initial search and sampling was a constitutional administrative search.[3]

**[1]** As a general rule, searches and seizures violate the Fourth Amendment unless they are based on probable cause and executed pursuant to a valid search warrant. *See Katz v. United States*, 389 U.S. 347, 357 (1967). The protection against unreasonable searches and seizures extends to commercial premises, *see Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 550 (9th Cir. 2004), and it also applies in the context of civil forfeiture proceedings, *see One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 696 (1965).

**[2]** The United States Supreme Court, however, has carved out a limited number of contexts within which a warrant is not required. Administrative searches of "closely regulated" industries are one such exception and may be conducted without a warrant, so long as they meet certain standards of reasonableness. *See, e.g.*, *New York v. Burger*, 482 U.S. 691, 702-03 (1987). We do not require a warrant in such situations because "the federal regulatory presence is sufficiently comprehensive and defined that the owner of the commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." *Donovan v. Dewey*, 452 U.S. 594, 600 (1981). Industries deemed "closely regulated" under this doctrine include liquor distribution, *Colonnade Catering Corp. v. United States*, 397 U.S. 72 (1970); sale of sporting weapons, *United States v. Biswell*, 406 U.S. 311, 316 (1972); stone quarrying and mining, *Donovan*, 452 U.S. at 606; and automobile junkyards, *Burger*, 482 U.S. at 703-04; *United States v. Argent Chem. Labs., Inc.*, 93 F.3d 572, 575 (9th Cir. 1996) (veterinary drugs); *United States v. V-1 Oil Co.*, 63 F.3d 909, 911 (9th Cir. 1995) (transportation of hazardous materials). The

---

[3]Intrigue does not independently contest the constitutional validity of the sampling. Therefore, we consider the initial search and sampling together.

Supreme Court, in *Burger*, upheld a warrantless search and inspection regime for automobile junkyards that allowed police officers to inspect not only a company's business records but also the cars and auto parts stored on its property. In reaching its determination that automobile junkyards are closely regulated, the Court focused on "the pervasiveness and regularity of the federal regulation and the effect of such regulation upon an owner's expectation of privacy." *Burger*, 482 U.S. at 701 (internal quotation marks omitted); *see also Tucson Woman's Clinic*, 379 F.3d at 550.

The United States contends that FTZs are a "closely regulated" industry and that Customs Service regulations sufficiently authorize warrantless searches. As a result, those who store property within FTZs have a diminished expectation of privacy and adequate notice of the likelihood of warrantless inspections. We agree that, given the closely regulated nature of FTZs, a warrant is not required, so long as the search is otherwise reasonable.

Although storing cigarettes in an FTZ is more akin to a "business activity" than an "industry," we have previously approved administrative searches premised on the "closely regulated" nature of a particular commercial activity, even where the entire industry might not be tightly regulated. In *V-1 Oil*, we evaluated the constitutionality of a warrantless search provision in the federal Hazardous Materials Transportation Act. Although V-1 acknowledged that it was regulated by 331 different state and federal agencies, the company argued that it could not be subject to administrative searches because it was not part of the railroad industry or any other industry that could be deemed "closely regulated." *V-1 Oil*, 63 F.3d at 911. We disagreed, focusing not on the industry to which V-1 belonged but rather on the closely regulated nature of its business activity: "V-1 has a reduced expectation of privacy because it transports, sells, and stores propane gas." *Id.*; *see also United States v. Gonsalves*, 435 F.3d 64, 67 (1st Cir. 2006) (holding that "[w]hatever the status of the [medical]

profession in the abstract," the manufacture, storage, and dispensation of pharmaceuticals is closely regulated). Therefore, we need only decide whether the activity of storing merchandise in an FTZ is closely regulated.

[3] We first note that the regulation of FTZs is pervasive. An FTZ may be established only with the consent and authorization of a federal agency, the Foreign Trade Zones Board. 19 U.S.C. § 81b. Entities seeking to admit merchandise to an FTZ must submit an application and numerous supporting documents, 19 C.F.R. § 146.32; they must do so again if they wish to manipulate, manufacture, exhibit, or destroy their merchandise, *id.* § 146.52; and they must gain permission yet again from the Port Director to remove their merchandise from a zone, *id.* § 146.71. Each of these steps is tightly controlled, requires documentation, and is subject to Customs supervision. Detailed regulations also address safety conditions, security, and recordkeeping responsibilities within FTZs. *See id.* §§ 146.4, 146.21-26; 15 C.F.R. § 400.46. Most importantly, the statute and accompanying regulations clearly authorize the Customs Service to monitor, search and inspect items stored therein. Customs Service officers have primary responsibility for policing the admission of foreign goods into customs territory. *See* 19 U.S.C. § 81d; 19 C.F.R. § 146.3. FTZ operators must "permit any Customs officer access to a zone," 19 C.F.R. § 146.4(b), and once on-site, those officers may examine any merchandise stored in an FTZ so long as "the examination is considered necessary to facilitate the proper administration of any law, regulation, or instruction which Customs is authorized to enforce." *Id.* § 146.10. The Foreign Trade Zones Manual, which serves as a comprehensive guidebook for zone users and operators, further emphasizes the breadth of the Customs Service's authority:

> To properly enforce the laws and regulations, Customs officers are given considerable authority to conduct searches, arrest suspected violators, and seize merchandise and articles. . . . Merchandise may

be seized by any Customs officer who has reasonable cause to believe that any law or regulation enforced by Customs has been violated, by reason of which the merchandise has become subject to seizure or forfeiture.

United States Customs & Border Protection, Foreign Trade Zones Manual 197-98 (2003) (citing 19 C.F.R. § 162.21).[4] These numerous and specific regulations should have provided sufficient notice to Intrigue "that its property and records will from time to time be inspected by government officials," *V-1 Oil*, 63 F.3d at 912 (internal quotation marks omitted), and that its goods might be subject to occasional sampling.

[4] The duration and regularity of this scheme also supports our conclusion that the commercial activity of storing merchandise in FTZs is "closely regulated." Customs supervision has been part of the scheme for FTZs since they were conceived in 1934. Section 146.10, which enables warrantless searches of merchandise in FTZs by Customs Service agents has been in place since 1969,[5] and was not modified during the period of Intrigue's operations. Moreover, the Carson FTZ zone operator testified that Customs officials inspected Intrigue's inventory and manipulation activity "two to three times a year" during the thirty months Intrigue rented space there.

Intrigue correctly points out that "domestic status" goods, like Intrigue's cigarettes, which have come through Customs

---

[4]http://www.cbp.gov/~xp/cgov/toolbox/publications/manuals_handbooks/.

[5]From 1970 to 1984, a regulatory provision with almost identical language was located at 19 C.F.R. § 146.6. *See* 49 Fed. Reg. 28,855, 28,878 (July 17, 1984); 35 Fed. Reg. 9262, 9263 (June 13, 1970). Between 1969 and 1970, the provision authorizing Customs Service examinations of merchandise in FTZs could be found at 19 C.F.R. § 30.6. *See* 34 Fed. Reg. 4957 (Mar. 7, 1969).

and on which duties have been paid, are subject to less scrutiny and regulation than goods in international transshipment or domestic goods bound for export. That fact, however, does not relieve Intrigue from most of the FTZ regulations, including especially the search provisions of sections 146.4 and 146.10. In *Burger*, the Supreme Court held that a regulatory scheme far less comprehensive and enacted more recently nonetheless rendered automobile junkyards "closely regulated." The New York statute, less than five years old when the warrantless inspection occurred, *Burger*, 482 U.S. at 705, was comparatively limited in scope. It required junkyard owners to obtain a license and keep records of vehicles coming into and leaving their possession, and allowed police officers to examine the records or the vehicles during normal business hours. *Id.* at 694 nn.1 & 3. The regulatory regime for "domestic status" goods in FTZs is at least as pervasive and well-established.

Next, we disagree with Intrigue that the FTZ regulations fail to clearly authorize warrantless searches. In support of its contention, Intrigue cites a statutory provision detailing obligations for Customs Service officers:

> If any officer or person authorized to make searches and seizures has probable cause to believe that—(A) any merchandise . . . which has been otherwise brought into the United States unlawfully . . . is in any dwelling house, store, or other building or place, he may make application, under oath, to any [authorized judge], and shall thereupon be entitled to a warrant to enter . . . and to search for and seize such merchandise or other article described in the warrant.

19 U.S.C. § 1595(a)(1). In *United States v. Mendoza-Ortiz*, 262 F.3d 882, 885 (9th Cir. 2001) (per curiam) we held that 19 U.S.C. § 1595(a) required Customs officers to obtain a warrant to search a private warehouse, even though they had probable cause to believe drugs were located on the site. 262

F.3d at 885. An FTZ, however, is not private property. It is a heavily regulated, government created and controlled location at which only particular commercial activity, defined by the government, is allowed. Business activities that otherwise would be private fall under extensive federal control and Customs supervision when they are conducted in FTZs. Our decision in *Mendoza-Ortiz* turned on the fact that the search involved private activity at a private facility, one that typically would be shielded from government intervention. Indeed, in *Mendoza-Ortiz*, we were careful to note that the officers could have intercepted the drugs at the border or at any place en route to the private warehouse without a warrant; it was only "[a]t the moment the planks were unloaded into Space G" that a warrant became necessary. *Id.* Furthermore, the specific statute and regulations giving Customs search and inspection power over merchandise in FTZs, 19 U.S.C. § 81d; 19 C.F.R. §§ 146.3, 146.4, 146.10, trump the more general statute requiring a warrant in the majority of situations, 19 U.S.C. § 1595. *See Bonneville Power Admin. v. FERC*, 422 F.3d 908, 916 (9th Cir. 2005) (describing the "basic principle of statutory construction . . . that the specific prevails over the general").

We also reject Intrigue's similar argument that the statute and regulations do not authorize a "warrantless search and seizure" because they do not use those particular terms. Neither of the statutes held to authorize administrative searches in *Burger* and *V-1 Oil* used the words "warrantless search and seizure." In *Burger*, the statute allowed "any police officer . . . to examine" vehicle records, vehicles, and vehicle parts. 482 U.S. at 694 n.1 (citing N.Y. Veh. & Traf. Law § 415-a5 (McKinney 1986)). In *V-1 Oil*, the statute empowered "any officer, employee, or agent to enter upon, inspect, and examine, at reasonable times and in a reasonable manner, the records and properties of persons [relating to transportation or shipment of hazardous materials]." 63 F.3d at 912 (citing 49 U.S.C. § 1808(c) (1988)). We decline to hold that the words "warrantless search and seizure" are talismanic.

**[5]** Even though we conclude that the FTZ regulations clearly authorize inspections without warrants and that the storage of goods in FTZs is "closely regulated" commercial activity, to satisfy the Fourth Amendment, the administrative search must also be reasonable. In *Burger*, the Supreme Court held that a warrantless search is nevertheless reasonable if three conditions are satisfied: 1) the underlying regulatory scheme advances a substantial government interest; 2) warrantless inspections are "necessary" to further the regulatory scheme; and 3) the inspection program provides a "constitutionally adequate substitute for a warrant." *Burger*, 482 U.S. at 702-03 (internal quotation marks omitted); *V-1 Oil*, 63 F.3d at 911. Each of these conditions is met here.

**[6]** First, the underlying regulatory scheme for FTZs advances the government's substantial interest in ensuring that duties are paid, that consumers are protected from counterfeit or adulterated cigarettes, and that country-of-origin labels are reviewed. Second, it is plain that a warrantless inspection program is necessary to further the regulatory scheme, because here, as in *V-1 Oil*, advance notice of inspections could permit those violating American customs laws "to temporarily correct violations and frustrate enforcement efforts." 63 F.3d at 912. This is particularly the case for so-called "domestic status" goods, like Intrigue's cigarettes, because they can be moved in and out of FTZs without permits. *See* 19 C.F.R. § 146.71.

**[7]** Third, the FTZ regulations provide a "constitutionally adequate substitute for a warrant." As the Supreme Court explained in *Burger*,

> the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers.

482 U.S. at 703; *see also Argent Chem. Labs.*, 93 F.3d at 576. The FTZ regulations provide adequate notice that inspections will occur in accordance with the law. 19 C.F.R. sections 146.4 and 146.10 identify who will be performing the searches ("any Customs officer"), the object of the search ("merchandise"), the timing of searches ("at the time of admission to a zone, or at any time thereafter"), and the circumstances under which searches are allowed (only as "necessary to facilitate the proper administration of any law, regulation, or instruction which Customs is authorized to enforce"). Furthermore, the record indicates that Customs officials inspected Intrigue's storage area two to three times per year. The "certainty and regularity" of these searches indicate that Intrigue was aware that its property would be subject to lawful periodic inspections. *See Burger*, 482 U.S. at 703; *Donovan*, 452 U.S. at 600.

Although the FTZ regulations place few limits on the discretion of searching officers, we are confident that they are sufficient. The Supreme Court's opinion in *Burger* instructs that we should review the scheme's limitation on officer discretion in context. The *Burger* Court upheld the New York vehicle-dismantling statute, even though it did not indicate how often searches would occur, provided virtually no limitation on the scope of the search within automobile junkyards, and failed to "provide[ ] limits or guidance on the selection" of businesses for inspection. 482 U.S. at 722-23 (Brennan, J., dissenting). The Court instead relied on the restriction of the searches to certain types of businesses and certain types of items that could be inspected. *Id.* at 711 (majority opinion). The same basic limitations are present in the FTZ statute and regulations.

Moreover, because companies operating in FTZs do not have the expectation of privacy one would have in a private home or business, we require fewer safeguards to satisfy us that the search is reasonable. In *Rush v. Obledo*, we struck down as unconstitutional a regulation that enabled warrantless

searches of family-home day care facilities because it failed to place any limits on the time of searches, the area that could be searched, or the regularity of searches. 756 F.2d 713, 721 (9th Cir. 1985). The overbroad search provision would have authorized searching anywhere within day care providers' private residences, even in areas unconnected to the provision of day care, at any time of day. As we explained, constitutionally adequate searches "must be directly connected with the environment the Legislature seeks to regulate—i.e., the areas of the home used by children when the children are present." *Id.* Similarly, in *Argent Chemical Laboratories*, we concluded that a statute authorizing warrantless FDA searches of veterinary drug manufacturers was reasonable, because notice was furnished at the time, the statute limited the scope of what could be inspected and what could be seized, and most seizures required approval from a district office before items could be seized. 93 F.3d at 576-77. In that case, allowing searches of pharmaceutical plants without those limitations would have far exceeded the FDA's interest in regulating the "safety and effectiveness" of veterinary drugs. *Id.* at 576. Here, unlike the situation in *Rush*, the area in which searches are authorized (FTZs) is the same area subject to regulation. There is minimal risk that Customs Service officers will go beyond the scope prescribed by the FTZ regulations, because virtually all the activities that take place within an FTZ fall within the scope of Customs inspection and monitoring. *See A.T. Cross Co. v. Sunil Trading Corp.*, 467 F. Supp. 47, 51 (S.D.N.Y. 1979).

Finally, we note the settled expectations that surround the use and control of FTZs. It is long-established and well understood that, in exchange for the benefits afforded to users of FTZs, those who store merchandise in FTZs must keep Customs apprised of their activities and afford Customs officials the right to inspect their operations. Intrigue was well aware of this trade-off when it decided to run its operations out of an FTZ.

**[8]** We therefore hold that the Customs Service searches authorized by the FTZ regulations are "directly connected with the environment the Legislature seeks to regulate," *Rush*, 756 F.2d at 721, and the FTZ regulatory scheme provides a constitutionally adequate substitute for a warrant. The warrantless search of Intrigue's storage area and the initial sampling constituted a valid and reasonable administrative search.

B.   Probable Cause for Seizure of all 4,432 Mastercases

**[9]** We next conclude that, under the "totality of the circumstances" confronting the Customs Service, probable cause supported the government's seizure of all 4,432 mastercases of cigarettes on April 6, 2001. As we held in *United States v. One 1978 Piper Cherokee Aircraft*:

> The standard for probable cause in forfeiture proceedings resembles that required to support a search warrant. The determination of probable cause is based upon a "totality of the circumstances" test, and the government's evidence must be more than that which gives rise to a mere suspicion, although it need not rise to the level of prima facie proof.

91 F.3d 1204, 1208 (9th Cir. 1996) (citations omitted).[6] Thus, probable cause to seize property does not require absolute certainty, but only a "fair probability" that the property is contraband. *See United States v. Sokolow*, 490 U.S. 1, 7 (1989); *United States v. Alaimalo*, 313 F.3d 1188, 1193 (9th Cir. 2002). Because judicial constructs like "probable cause" and "reasonable suspicion" are "fluid concepts that take their substantive content from the particular contexts in which the standards are being assessed," *Ornelas v. United States*, 517

[6]Although the United States points to regulatory provisions indicating that the appropriate standard might be the lesser "reasonable cause" instead of "probable cause," because we find that probable cause existed, we do not reach this issue.

U.S. 690, 696 (1996), we give reasonable deference to the inferences and judgments of experienced agents in the field, *see id.* at 700; *United States v. $129,727.00 U.S. Currency*, 129 F.3d 486, 489 (9th Cir. 1997).

The Customs Service agents encountered the following combination of circumstances when they inspected the Carson FTZ. The FTZ operator initially indicated that there were no cigarettes on-site, but an FTZ employee queried the next day led Customs officers to Intrigue's cigarette storage space. The FTZ operator could not immediately produce records for Intrigue's cigarettes, records the zone operator generally maintains and must have "readily available for Customs review." 19 C.F.R. § 146.4(d). The FTZ employees did not have a key to the storage area, and an Intrigue employee showed up with a key only when Customs was preparing to break the lock. Intrigue's storage cage was covered with a black tarp and the pallets inside were wrapped in opaque black plastic, both elements that Senior Customs Inspector Rudolfo Villacana testified he had not encountered before. When an Intrigue employee showed up, he was not initially able to produce any documentation that duties had been paid on the cigarettes. The next day, Customs inspectors (accompanied by a government chemist) performed field tests on sample packs of Intrigue's cigarettes, which indicated that the cigarettes were "likely counterfeit," "possibly counterfeit," or at least "appeared to be counterfeit." Inspector Villacana declared that this combination of factors caused him to be "very suspicious that the mastercases were entered illegally." Although Intrigue now offers explanations for each of these circumstances, at the time, an objectively reasonable Customs officer could properly conclude that probable cause existed for seizure. *See Ornelas*, 517 U.S. at 696.

[10] Intrigue's contention that the field test results were not sufficiently certain to support a finding of probable cause lacks merit. The Supreme Court has upheld probable cause determinations that are based on ambiguous or inconclusive

field tests, even in the absence of other evidence supporting a finding of probable cause. For example, in *Illinois v. Caballes*, the Supreme Court upheld the search of a car based on a dog-sniff detection of narcotics, 543 U.S. 405, 410 (2005), even though evidence in the record indicated that Illinois drug dogs return false positives anywhere from 12.5% to 60% of the time, *id.* at 412 (Souter, J., dissenting). Here, moreover, the "likely counterfeit"/"possibly counterfeit" field test results did not stand alone. They were one of a combination of circumstances giving rise to probable cause for the seizure.

**[11]** Once Customs officers had probable cause to believe the merchandise was counterfeit, it was within their discretion to seize all of the cigarettes. "Property may be seized, if available, by any Customs officer who has reasonable cause to believe that any law or regulation enforced by the Customs Service has been violated, by reason of which the property has become subject to seizure or forfeiture." 19 C.F.R. § 162.21(a). Similarly, 19 C.F.R. § 162.11 allows Customs officers "lawfully on any premises and [ ] able to identify merchandise which has been imported contrary to law [to] seize such merchandise without a warrant." We therefore hold that the seizure was based on probable cause and statutorily authorized.[7]

## C.   Retention of the Mastercases

Intrigue contends that even if probable cause existed for the seizure of the 4,432 mastercases, the Customs Service lacked probable cause to retain them once the Rudalevige test returned inconclusive results on April 9, 2001. Intrigue is correct as a matter of law that when there ceases to be probable cause for continuing a search or seizure, it must end immediately. *See Jacobs v. City of Chicago*, 215 F.3d 758, 772 (7th

---

[7]We do not reach the United States' alternative argument that it was justified in seizing all the mastercases without a warrant because of exigent circumstances.

Cir. 2000). However, because Intrigue mischaracterizes the import of the Rudalevige test, we cannot agree that probable cause evaporated with its failure to reach conclusive results. Probable cause existed at each step in the Customs Service's investigation of the cigarettes.

By April 19, 2001, when Phillip Morris definitively established that the cigarettes were not counterfeit, the Customs Service had developed new bases for probable cause, as its inventory of the cigarettes had turned up country-of-origin and re-importation violations. Intrigue does not dispute this fact but instead contends that there was a one-day break in probable cause, between the completion of the inconclusive Rudalevige test on April 9 and the discovery of previously-denied cigarettes on April 10. It contends that once the Rudalevige test failed to establish with certainty that the cigarettes were counterfeit, the inventory should have stopped and the cigarettes should have been returned to Intrigue.

We disagree. Intrigue asserts that the Rudalevige test "proved wrong" the initial field tests indicating that the cigarettes might be counterfeit. That is not correct. The Rudalevige test report identifies a number of characteristics of the tested cigarettes that were similar to genuine gray market cigarettes, including "the filter holes, the glue, the printing, the cigarette packing, the control number, the folding pattern of the foil, the lack of fluorescence, the placement of the material codes, and the statement 'Blend of USA.' " However, the report also notes that the lack of codes on the filter paper, the misspelling of Switzerland on two of the sample packs, and a number of "signs of poor quality control," such as uneven folds, poorly aligned bands on the filters, and loose tobacco in the packages, raised red flags about their genuineness. Due to these potentially troubling factors, the Rudalevige test report stated, "We cannot draw any conclusion based on these observations." The report recommended sending the cigarettes to Phillip Morris for further testing. The Rudalevige test results did not dispute, or even address, the

findings of the initial field tests. They merely indicated that additional testing would be required to determine with any certainty whether the cigarettes were counterfeit or not.

**[12]** The inconclusive Rudalevige test did not extinguish probable cause. Indeed, the test report noted several additional factors that would have supported a probable cause determination. Rudalevige found these elements troubling enough that he sought further testing from the supposed manufacturer. Furthermore, virtually all of the factors that had generated support for the initial seizure, including the suspicious circumstances of Intrigue's storage and the field tests indicating that the cigarettes were "possibly" or "likely" counterfeit, remained in play and supported probable cause.

Intrigue points to one out-of-circuit district court case to support its argument that an inconclusive test result nullifies probable cause to continue seizure. *See United States v. One DLO Model A/C, 30.06 Mach. Gun*, 904 F. Supp. 622 (N.D. Ohio 1995). *One DLO Model* dealt with the arcane issue of whether a 28 U.S.C. § 2465 "certificate of reasonable cause," which exempts federal officials from liability after a judicial determination that the government wrongly seized property for forfeiture, should be predicated on the appropriateness of the initial evidentiary seizure or alternatively on the appropriateness of the "warrant for the arrest of property" that enables forfeiture. *Id.* at 636, 638. The claimant had been charged with federal weapons violations and the case turned only on whether or not he had forged documents transferring ownership of the weapons to himself. *Id.* at 641-42. However, during the investigation that followed the initial seizure, neither the government's nor the claimant's forensic experts found anything that would indicate that the claimant had forged the documents. *Id.* at 642 (noting that "[t]here was no longer any evidence linking [claimant] to the forgery . . . rising above mere suspicion"). Therefore, the court held, while the government might have had probable cause to seize the weapons pursuant to the search warrant, that probable cause had evapo-

rated by the time the government filed the complaint to forfeit them. *Id.*

**[13]** Even if *One DLO Model* were controlling authority, it would not compel the result Intrigue seeks. In *One DLO Model*, the forensic tests exonerated the claimant. The Rudalevige test, on the other hand, produced findings both inculpatory and exculpatory. In addition, the Customs Service still possessed evidence from the initial field test that the cigarettes might indeed be counterfeit. Intrigue was not exonerated on the counterfeiting charge until April 19, days after the new violations were discovered. *Cf. One DLO Model*, 904 F. Supp. at 642 (noting that the exonerating evidence was possessed by government officials "well before the filing of the complaint and the subsequent seizure"). The probable cause that existed on April 6 did not lapse before the additional bases for probable cause (for violating other importation laws) arose on April 10.

## III.  CONTRABAND CIGARETTES TRAFFICKING ACT

Next we consider the United States' cross-appeal, challenging the district court's decision that the Contraband Cigarettes Trafficking Act ("CCTA") was inapplicable to Intrigue's cigarettes because the California cigarette tax is an ad valorem tax, expressly precluded by the FTZ Act from application to goods stored in FTZs. We agree with the United States that the district court misapprehended the nature of the California cigarette tax.

This dispute arises at the intersection of two federal laws: the CCTA, which authorizes the federal forfeiture of cigarettes found in a state without the appropriate state tax stamps, and the FTZ Act, which specifically limits the application of state and local taxes. The CCTA makes it unlawful "for any person knowingly to ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes," 18 U.S.C. § 2342(a), and allows the federal government to seize and for-

feit such cigarettes, *id.* § 2344(c). The CCTA, at the time of the seizure, defined "contraband cigarettes" as

> a quantity in excess of 60,000 cigarettes, which bear no evidence of the payment of applicable State cigarette taxes in the State where such cigarettes are found, . . . in the possession of any person other than [a permitted manufacturer, common carrier, entity licensed to pay cigarette taxes by other means, or federal or state agency or employee].

*Id.* § 2341(2) (2005).[8] Federal liability under the CCTA is thus predicated on the non-payment of state taxes or any other violation of an applicable state cigarette tax law. *See United States v. Gord*, 77 F.3d 1192, 1193 (9th Cir. 1996). The FTZ Act, however, prohibits state and local governments from imposing ad valorem taxes on tangible personal property held in FTZs. 19 U.S.C. § 81o(e). Therefore, whether Intrigue's cigarettes were contraband and seizable for failure to pay the California tax turns on whether California's cigarette tax is properly characterized as an ad valorem tax or an excise tax.

## A.   Nature of Cigarette Tax

[14] We hold, contrary to the district court, that the California cigarette tax is an excise tax, not expressly precluded by the FTZ Act. 19 U.S.C. § 81o(e). An ad valorem tax is defined by its method for calculating the size of the tax. *Ad valorem* is the Latin phrase for "according to value," and it describes a tax the size of which directly correlates to the value of the item taxed. *See Quinault Indian Nation v. Grays*

---

[8]A 2006 amendment to the CCTA lowered the threshold for contraband cigarettes from 60,000 to 10,000 cigarettes. *See* USA Patriot Improvement & Reauthorization Act of 2005, Pub. L. 109-177, § 121(a)(1), 120 Stat. 192, 221 (2006). Congress also amended the CCTA to include non-payment of local taxes as a source of liability. *Id.* § 121(b)(6), 120 Stat. at 222. Neither of these changes affects our analysis.

*Harbor County*, 310 F.3d 645, 647 n.1 (9th Cir. 2002). The most common example of an ad valorem tax is the local property tax. An excise tax, by contrast, is one "imposed on the performance of an act . . . or the enjoyment of a privilege." *Id.* at 651 (citing Black's Law Dictionary 563 (6th ed. 1990)) (alteration in original). The quintessential excise tax in our country is the sales tax. An excise tax, because it is based on a particular transaction or activity, can be imposed only once per act, whereas an ad valorem property tax can be imposed annually, as is typical of property taxes.

**[15]** The California cigarette tax makes no reference to value, instead calculating the tax solely according to the number of cigarettes distributed within the state. The statute provides: "Every distributor shall pay a tax upon his or her distributions of cigarettes at the rate of . . . [\$0.006 per cigarette distributed] on and after 12:01 a.m. on January 1, 1994." Cal. Rev. & Tax. Code § 30101. The statute also imposes separate taxes of \$0.0125 per cigarette to fund community health education and disease research, *id.* §§ 30121-30129, and \$0.025 per cigarette to fund early child development programs, *id.* § 30131. Distributors, therefore, owe the state 4.35 cents per cigarette, whether the cigarettes are very expensive Dunhills, mid-priced Salems, or lower-priced Dorals.

**[16]** On its face, the California tax is not imposed ad valorem, but rather is an excise tax. *See Cal. State Bd. of Equalization v. Chemehuevi Indian Tribe*, 474 U.S. 9, 10-11 (1986) (repeatedly describing California's cigarette distribution tax as an excise tax). The tax does not in any way correlate to value, and it is imposed only once, when the cigarettes are "distributed." See Cal. Rev. & Tax. Code § 30008 (defining "distribution"). Intrigue argues, however, that imposing the per-cigarette tax on the act of storing the cigarettes in California for future sale "transform[s]" the tax into an ad valorem tax. We reject the notion that a tax calculated in a manner other than *ad valorem* can be an ad valorem tax.

That conclusion is consistent with our case law and the language of the California statute. We have previously determined that a tax on the storage of goods for out-of-state sale may nonetheless be an excise tax. *Mount Tivy Winery v. Lewis*, 134 F.2d 120 (9th Cir. 1943). In *Mount Tivy*, a California-based winery challenged a federal tax on wine stored for future sale as an unconstitutional direct tax. *Id.* at 122. The outcome of the case similarly turned on whether the tax at issue was an excise tax or an ad valorem property tax. After reviewing the Supreme Court's definition of an excise tax, "a tax imposed upon a particular use of property or the exercise of a single power over property incidental to ownership," we held that the liquor tax was indeed an excise tax. *Id.* at 124-25 (quoting *Bromley v. McCaughn*, 280 U.S. 124, 136 (1929)).

**[17]** The language of California's cigarette tax, which is imposed on "the exercise of any right or power" over cigarettes, Cal. Rev. & Tax. Code § 30009, parrots the terminology of *Mount Tivy* and of the "use taxes" common throughout the United States. *See, e.g.*, Cal. Rev. & Tax. Code § 6201; Mo. Rev. Stat. § 144.610; Tex. Tax Code Ann. § 151.011; Vt. Stat. Ann. tit. 32, § 9701(15). As B.E. Witkin explains in his foundational treatise on California law, the use tax is an "excise tax imposed . . . on the *storage, use or other consumption* in [a] state of tangible personal property." Witkin, Summary of California Law, Vol. 9, § 305 (9th ed. 1989). We therefore conclude that a tax on cigarettes placed in storage does not transform an excise tax into an ad valorem tax.

### B.   CCTA Application to Cigarettes Stored for Out-of-State Sale

Intrigue also argues that even if the California cigarette tax is an excise tax, by its terms, it does not reach the storage of cigarettes to be sold in another state. Because the district court found that the California tax was an ad valorem tax, it did not reach this question. We reject Intrigue's argument and hold

that California law requires unlicensed distributors like Intrigue to pay cigarette taxes on cigarettes stored in California for out-of-state sale.

The plain language of the statute compels this reasoning. *See United States v. Daas*, 198 F.3d 1167, 1174 (9th Cir. 1999) ("The first step in ascertaining congressional intent is to look to the plain language of the statute."). We follow the plain meaning of a statute unless it is ambiguous or its application would lead to unreasonable results. *Id.*

**[18]** California taxes "distributions" of cigarettes, requiring "distributors" to either affix a pre-paid stamp on the pack of cigarettes or make direct payment to the state. Cal. Rev. & Tax. Code §§ 30101, 30161. "Distribution" is defined as either the "sale of [previously] untaxed cigarettes or tobacco products in this state," or "[t]he use or consumption of untaxed cigarettes or tobacco products in this state." *Id.* § 30008. In turn, "use or consumption" is defined as

> the exercise of any right or power over cigarettes or tobacco products incident to the ownership thereof, other than the sale of the cigarettes or tobacco products or the keeping or retention thereof by a licensed distributor for the purpose of sale.

*Id.* § 30009.

We agree with the United States that California's use of the term "the exercise of any right or power over cigarettes . . . incident to [ ] ownership" is intended to include the act of storage. A number of courts and statutes have recognized or approved this interpretation. For example, in *D.H. Holmes Co. v. McNamara*, the United States Supreme Court upheld against a Commerce Clause challenge a Louisiana use tax that defined "use" as "the exercise of any right or power over tangible personal property incident to ownership, and includes consumption, distribution, and storage." 486 U.S. 24, 27

(1988). Similarly, in *Mount Tivy Winery*, we held that the "activity of holding wine intended for sale" could be taxed under a statute that imposed taxes on the "exercise of a single power over property incidental to ownership." 134 F.2d at 124 (internal quotation marks omitted). *See also Dept. of Revenue of State of N.M. v. United States*, 408 F.2d 574, 576-77 (10th Cir. 1969) (describing New Mexico excise tax which defined "use" as "exercise of any right or power over tangible personal property incident to . . . ownership" and laid the tax on "personal property stored, used or consumed in state"); *Texas Co. v. Siefried*, 147 P.2d 837, 844 (Wyo. 1944) (holding that a tax on "use" reached the storage and withdrawal from storage of gasoline).

**[19]** Given the definition of "distribution" in § 30008, we cannot accept Intrigue's argument that the California statute is intended to tax only sales of cigarettes. Because California explicitly defined the term in the statute, we need not resort to dictionary definitions of "distribution." *See Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 880 (9th Cir. 2002). California's definition of "distribution" includes not only the "sale of untaxed cigarettes in this state" but also the use and consumption of cigarettes. All other exercises of right or power over cigarettes, including storage, fall within this second definition of "distribution." Cal. Rev. & Tax. Code § 30009. Intrigue's proposed interpretation would write out of the statute the second basis for § 30008 tax liability, something we must seek to avoid. *See Miller v. United States*, 363 F.3d 999, 1008 (9th Cir. 2004) ("Courts must aspire to give meaning to every word of a legislative enactment.").

Our interpretation of the California statute is reinforced by the exception built into § 30009. California explicitly exempts from its definition of "use or consumption" the "keeping or retention [of cigarettes] by a *licensed* distributor for the purpose of sale." Cal. Rev. & Tax. Code § 30009 (emphasis added). Thus, "use or consumption" would have to include the keeping or retention for sale of cigarettes by an *unlicensed*

distributor. Intrigue concedes it was not a licensed distributor within the state of California at the time of seizure; therefore, it would not qualify for the exception.

The legislative history of the "use or consumption" definition in § 30009 further confirms our conclusion that the California cigarette tax reaches Intrigue's cigarettes. The California legislature, in 1998, amended the exception to § 30009 for "the keeping or retention thereof for the purpose of sale" to add the words "by a licensed distributor." Act of Aug. 28, 1998, ch. 420, § 4, 1998 Cal. Legis Serv. 420 (S.B. 2230) (West). The legislative history of Senate Bill 2230, which enacted this amendment, indicates that California intended to make unlicensed distributors liable for taxes on any unstamped cigarettes found in their possession. It reads: "This bill . . . revises the definition of 'use and consumption' to allow for the imposition of the tax on inventory seized while in the possession of an unlicensed distributor . . . ." California Bill Analysis, Assembly Committee, 1997-1998 Regular Session, Senate Bill 2230 (Aug. 5, 1998). Elsewhere, the legislative history offers a more thorough explanation, envisioning the precise scenario presented in this case:

> Unlicensed distributors have been known to obtain cigarettes and sell them directly to consumers without the cigarette tax having been paid. However, under current law, unlicensed distributors cannot be held liable for the cigarette tax on unstamped cigarettes that are seized because they can claim that a large portion of their inventory is being held for purposes of resale, rather than for direct sale to consumers.

> This bill would draw a distinction between licensed and unlicensed distributors. Unlicensed distributors would be liable for tax on all unstamped cigarette or tobacco products found in their possession. The presumption would be that the unlicensed

> distributor is really in the business of selling cigarettes to consumers. Licensed distributors would not be liable for unstamped products in their possession.

California Bill Analysis, Senate Floor, 1997-1998 Regular Session, Senate Bill 2230 (May 6, 1998).

Unlicensed distributors, like Intrigue, were precisely the target of the 1998 amendment. Indeed, Intrigue's owner Andy Lee testified that Intrigue kept the cigarettes in an FTZ because he believed that, by doing so, Intrigue could avoid paying California taxes. The clear implication of the statute, as amended in 1998, is that an unlicensed distributor like Intrigue owes taxes when it stores cigarettes within the state of California.

The distinction between licensed and unlicensed cigarette distributors also has practical merit. As the United States, and amicus California Board of Equalization ("BOE"), contend, the statutory scheme intentionally creates an "either/or" system that balances fairness to distributors with the government interest in combating cigarette smuggling. A distributor may choose to obtain a license, in which case it must report the cigarettes it brings into or ships out of state; or it may remain unlicensed but face liability for taxes on any cigarettes found in its possession, even if it intends to ship the cigarettes elsewhere. Contrary to Intrigue's representations at oral argument, licensed distributors are required to file regular reports with the California BOE detailing their inventories (both tax-stamped and unstamped), any distributions or sales, and the tax they believe is due. *See* Cal. Rev. & Tax. Code §§ 30182(a), 30183(a); Cal. Code Regs. tit. 18, §§ 4022, 4031. Licensed distributors must also keep a record of all cigarettes stored on a particular site, a record which must be made available to the BOE upon request. *See* Cal. Rev. & Tax. Code § 30454; Cal. Code Regs. tit. 18, § 4026. Taxing the cigarettes of unlicensed distributors is a precautionary measure to limit the state's financial risk that a distributor will

claim cigarettes are destined for export, only to sell them at the lower, pre-tax price within California.

Intrigue argues that our reading of the statute would enable a system of double taxation, because it would be taxed for storing cigarettes in California and then taxed again when it sells the cigarettes in another state. We find this argument unavailing. First, any risk of double taxation would apply only to the small number of distributors who neglect to obtain a California license. Second, section 30008 makes clear that the "use or consumption" tax is due not for the sale, but rather for the privilege of storing the cigarettes within the state, a right that imposes on the state the reciprocal burdens of protecting and monitoring the cigarettes stored there. Third, California provides a legal procedure for companies like Intrigue, when they actually sell the cigarettes in another state, to petition the California BOE for a credit or refund of taxes on those cigarettes sold out of state. *See* Cal. Rev. & Tax. Code §§ 30176.1, 30178.1-2. In that way, the specter of double taxation can be avoided altogether.

Intrigue also asserts that, because the legislative history of the CCTA indicates that its purpose was to combat organized crime and bootlegging, Intrigue, as a legitimate business, should not be subject to the law. Even assuming, as we do, that Intrigue is a legitimate business, this argument lacks merit. The explicit language of the statute does not limit the CCTA to organized crime or bootlegging operations; any knowing possession, sale, or receipt of contraband cigarettes exposes one to liability under the statute. *See* 18 U.S.C. § 2342(a). Furthermore, it defies logic that, under a penal statute, a defendant who violated clear statutory provisions could escape punishment merely because his particular class of criminal offenders was unmentioned in the authorizing statute's legislative history.

For similar reasons, we reject Intrigue's argument that the CCTA is inapplicable to Intrigue because its operations were

closely monitored by state and federal officials and because the United States offered no proof that it "evaded" tax laws. The CCTA does not require an intentional evasion of the law to prompt forfeiture of cigarettes. *Compare* 18 U.S.C. § 2344(a), (b) (requiring "knowing" violations to trigger criminal punishments), *with id.* § 2344(c) ("Any contraband cigarettes involved in any violation of the provisions of this chapter shall be subject to seizure and forfeiture."). We have previously held that the federal government may seize and forfeit cigarettes whenever they are found in a state in violation of that state's tax laws, regardless of the possessor's intent to evade state tax laws or its intent to distribute the cigarettes in another state. *Grey Poplars, Inc. v. 1,371,100 Assorted Brands of Cigarettes*, 282 F.3d 1175, 1178 (9th Cir. 2002). This case is no exception.

Finally, we reject as factually unfounded Intrigue's argument that it owed no taxes because the cigarettes were in "joint possession" with NTI, Intrigue's sister corporation that was licensed to distribute cigarettes in California. Even Intrigue's CEO Andy Lee conceded during his deposition that, "Well, legally . . . Intrigue Trading, Inc. owned the product," agreeing that Intrigue "always had possession" of the cigarettes once they entered the FTZ. Intrigue offered no evidence indicating that it conveyed joint ownership rights over the cigarettes to NTI in a written document, as California law requires to establish joint ownership. *See Donovan v. Donovan*, 223 Cal. App. 2d 691, 697 (1964) (citing *California Trust Co. v. Bennett*, 33 Cal. 2d 694, 697 (1949)). Nor did NTI demonstrate "possession" by exerting any control over or taking any action with regard to the 4,432 mastercases, other than paying the rent on the storage space where they were located. *See* Black's Law Dictionary 1201 (8th ed. 2004) (defining possession as "the exercise of dominion over property" or "[t]he right under which one may exercise control over something to the exclusion of all others"). Furthermore, there is no indication in the record that NTI reported the acquisition of the cigarettes to the California BOE, as it would

have been required to do as a licensed distributor that believed itself to be a rightful owner. *See* Cal. Code Regs. tit. 18, §§ 4022, 4031. NTI does not cite to, and we cannot find, any authority suggesting that shared storage space creates this form of joint ownership or allows a company like Intrigue to piggyback on the license of a separate and independent corporation. Because there was no "joint possession" of the cigarettes, we need not decide whether "joint possession" by a licensed distributor could exempt a co-possessing unlicensed distributor from the California tax.

## C.    Preemption

Having concluded that California's cigarette tax applies to the storage of cigarettes in California destined for future out-of-state sale, we must reach the broader question whether the FTZ Act preempts all state and local efforts to impose taxes on merchandise stored within FTZs. We hold that it does not.

[20] Federal law may preempt state law under the Supremacy Clause of the Constitution. U.S. Const., art. VI, cl. 2. "Preemption can occur in one of three ways: express preemption by statute, occupation of the field, or conflict between state and federal regulation." *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 495 (9th Cir.), *petition for cert. filed*, 74 U.S.L.W. (Sept. 12, 2005) (No. 05-331). In any consideration of preemption, we view the purpose and intent of Congress as the "ultimate touchstone," *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992), and presume that Congress did not intend to supplant state law, *Air Conditioning & Refrigeration Inst.*, 410 F.3d at 496 (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).

[21] The FTZ Act does not expressly preempt all state regulation and taxation. "Express preemption occurs when Congress enacts a statute that expressly commands that state law on the particular subject is displaced." *Gadda v. Ashcroft*, 377

F.3d 934, 944 (9th Cir. 2004). The only express preemption in the FTZ Act is the prohibition on state and local ad valorem taxes. 19 U.S.C. § 81o(e). We view this limited statement of preemption through the canon of statutory construction *inclusio unius est exclusio alterius*, indicating Congress's lack of interest in more broadly limiting state power. *See Metrophones Telecomm., Inc. v. Global Crossing Telecomm., Inc.*, 423 F.3d 1056, 1072 (9th Cir. 2005); *United States v. Terrence*, 132 F.3d 1291, 1294 (9th Cir. 1997); *see also 3M Health Care Ltd. v. Grant*, 908 F.2d 918, 920-21 (11th Cir. 1990) (concluding that the FTZ Act does not expressly preempt all state power over FTZs).

**[22]** Nor do we find that Congress has expressed an intent to occupy the entire field of activity around FTZs, such that state law should be preempted, or that state regulation creates an irreconcilable conflict with the FTZ Act and federal regulation. As the Supreme Court has explained:

> [Field preemption] may be inferred from a scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, or where an Act of Congress touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.

*English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990) (internal quotation marks omitted). State law may also be preempted where it would be impossible for a party to comply with both state and federal requirements or where the state law would "stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal quotation marks omitted).

As discussed above, *supra* at pp. *6029-30*, there is significant federal control over the "field" of FTZs. However, sev-

eral factors militate against applying field preemption in this arena. First, the federal regulations implementing the CCTA, which Congress enacted forty-five years after the passage of the FTZ Act, envision that certain activities within an FTZ would remain subject to state cigarette taxes. Those regulations exempt from the CCTA both cigarettes in the stream of international commerce and domestic cigarettes destined for export, but not those like Intrigue's that have been entered into the United States for domestic consumption. In defining parties exempted from the CCTA, 27 C.F.R. § 646.143 includes "[a]ny person who is . . . (g) Operating within a foreign-trade zone established under 19 U.S.C., section 81b, when the cigarettes involved have been entered into the zone [pending foreign export] or, in respect to foreign cigarettes, have been admitted into the zone but have not been entered in the United States." The 4,432 mastercases at issue here do not fall within either of these exceptions. They had already passed through Customs in Miami, so they were no longer "foreign cigarettes," nor were they destined for foreign export. By implication then, the federal government has acknowledged that states retain taxing authority over some products within FTZs. Otherwise, the regulation would have exempted *every* person operating within an FTZ.

Second, the Supreme Court itself has indicated that the federal interest in domestic-bound goods stored in FTZs is not so dominant as to completely preclude state activity in this field. In a pair of cases from the 1980s, *Xerox Corp. v. Harris County, Texas*, 459 U.S. 145 (1982) and *R.J. Reynolds Tobacco Co. v. Durham County, North Carolina*, 479 U.S. 130 (1986), the Supreme Court addressed this same preemption question in the context of customs-bonded warehouses. Customs-bonded warehouses ("CBWs") and FTZs are functionally quite similar and often treated as one and the same. An importer may store goods in a CBW, just as he would in an FTZ, without paying duties until the products leave the CBW for domestic consumption. Also like in an FTZ, goods in the stream of foreign commerce may be temporarily stored

in a CBW, and may be manipulated, combined, or re-packaged before being sent abroad again, all without paying American duties. CBWs, however, need not be located adjacent to ports; the importer must pay a bond for the right to store merchandise in a CBW, which he gets back when the products are re-exported or domestic duties are paid; and the duties owed on goods that have been manipulated are set at the time of withdrawal from the warehouse (whereas an importer using an FTZ can choose whether to pay duties on the imported raw goods or the manipulated final product).[9] From a customs perspective though, FTZs and CBWs are far more alike than they are different.

In *Xerox*, the Supreme Court struck down an ad valorem property tax the Texas county sought to impose on copiers that had been built in Mexico and were being stored in a CBW until they could be sent to distributors in Latin America. The Court's reasoning combined elements of field preemption and conflict preemption. The Court first pointed to "the continuous control and supervision" of Customs officials over CBWs and the "[d]etailed regulations control[ling] every aspect of the manner in which the warehouses are to be operated," 459 U.S. at 150, which demonstrated a "pervasive" system of regulation, *id*. at 153. Then, after reviewing the legislative history of the Warehousing Act of 1846 and Congress's purpose in establishing CBWs, the Court also held that the state tax would "offset substantially the very benefits Congress intended to confer" in creating CBWs. *Id*.

**[23]** Four years later, in *R.J. Reynolds*, the Supreme Court clarified its preemption reasoning. The *R.J. Reynolds* Court held that a county was not preempted from imposing an ad valorem tax on foreign tobacco that R.J. Reynolds was storing and aging in CBWs, because Reynolds ultimately intended to

---

[9]United States Customs & Border Protection, *U.S. Customs Bonded Warehouse* (2001), www.cbp.gov/linkhandler/cgov/toolbox/publications/trade/bon ded_ 20wh2.ctt/bonded_20wh2.doc.

enter the tobacco into the United States for domestic manufacturing and consumption. At the beginning of its analysis, the Court explicitly pulled back from any "field preemptive" language in *Xerox*. *R.J. Reynolds*, 479 U.S. at 142 ("[The *Xerox* Court] limited its pre-emption analysis to whether taxation would impede the congressional objectives."); *see also id.* at 149 ("[T]he [customs] regulations, while detailed, appear to contemplate some concurrent state regulation and, arguably, even state taxation."). Then, after reviewing the same legislative history of the Warehousing Act of 1846 that it had examined in *Xerox*, the Court found that local taxes on imports destined for domestic consumption would not obstruct congressional objectives. *Id.* at 142-43 & n.10, 148. Seven years later, the Court reiterated that Congress had not occupied the entire field of taxation with regard to CBWs:

> [W]e have not held that state taxation of goods in bonded warehouses is pre-empted by Congress' intent to occupy the field of bonded warehouse regulation. In fact, in *R.J. Reynolds* we specifically held that the bonded warehouse statutes and regulations did not evidence such a purpose.

*Itel Containers Int'l Corp. v. Huddleston*, 507 U.S. 60, 71 (1993). For the same reasons, we hold that state regulation and taxation of goods in FTZs are not prohibited under the doctrine of "field preemption."

**[24]** With respect to conflict preemption, we read *Xerox* and *R.J. Reynolds* as drawing a clear distinction between goods within the stream of international commerce and goods destined for domestic consumption. In the former case, where federal duties are not even due, local taxation would inhibit the use of American ports; in the latter, federal duties will already be required and an exemption from local taxation would provide a windfall for foreign manufacturers that domestic manufacturers do not receive, hardly the aim of the statute. *R.J. Reynolds*, 479 U.S. at 144-46. As the Court

explained: "There is no indication in the legislative history of the Warehousing Act that one of the goals of the [CBW] system was to benefit imported goods in their competition with domestic goods." *Id*. at 145 n.14. Therefore, "[p]ermitting imposition of a tax . . . leads to equal treatment for imported and domestic tobacco." *Id*. at 147. This bifurcated approach to CBWs, treating goods differently depending on whether they are in foreign transshipment or destined for domestic consumption, is also consistent with the approach taken by California's courts. *See Am. Smelting & Refining Co. v. County of Contra Costa*, 271 Cal. App. 2d 437, 474 (1969) (concluding that "the laws and regulations relating specifically to [CBWs] do not . . . confer an immunity from a non-discriminatory tax on property of foreign origin being processed for domestic consumption").

The reasoning of the *R.J. Reynolds* opinion applies with equal force to FTZs. Intrigue cites dicta in a footnote to the *R.J. Reynolds* opinion to argue that the holding of that case should not extend from CBWs to FTZs. In its opinion at footnote 22, the *R.J. Reynolds* Court sought to explain why the then-recently passed 19 U.S.C. § 81o(e), which explicitly prohibited ad valorem taxes in FTZs, did not preclude it from approving an ad valorem tax in a CBW. After noting the limited scope of the 1984 amendment that inserted § 81o(e), the Court explained:

> Foreign trade zones are valued because they actually promote domestic industry and create jobs [citing 129 Cong. Rec. 14501 (1983) (remarks of Sen. Bentsen)]. Given that the taxation of goods in foreign trade zones could arguably harm domestic industry, while exemption from taxation of the imported goods in the present case would serve to discriminate against domestic producers, there appears to be a sufficient justification for the difference in state taxation with respect to these customs entities.

*R.J. Reynolds*, 479 U.S. at 151 n.22. We are unpersuaded that the dicta in footnote 22 compels the result Intrigue seeks.

We conclude that, outside the context of ad valorem taxes (which Congress expressly prohibited for property in FTZs), there is no reason to treat the two facilities differently. FTZs and CBWs serve almost identical roles in our system of inter-state commerce. The legislative history of the Warehousing Act of 1846, which enabled the creation of customs-bonded warehouses, indicates that the aim of CBWs was twofold: granting flexibility to importers as to when they pay their duties (duties need only be paid when the goods are removed from the CBW and entered into the United States); and encouraging shippers to utilize American ports as a way station in international commerce (because duties are never required if the goods are re-exported directly from the CBW). *See R.J. Reynolds*, 479 U.S. at 145-47 & nn.14-16 (providing detailed analysis of legislative history of Warehousing Act).

Foreign trade zones were created by Congress for the same basic purposes. Although there is no formal legislative history for the 1934 FTZ Act, its stated purpose was "to expedite and encourage foreign commerce, and for other purposes." Act of June 18, 1934, 48 Stat. 998, 998. Congress's twin aims in passing the FTZ Act, further encouraging use of United States ports in the flow of interstate commerce and enabling manipulation of foreign goods before they are imported, are apparent from the face of the statute. *See* 19 U.S.C. § 81c(a); *see also 3M Health Care*, 908 F.2d at 921 ("[T]he goal of the [FTZ Act] is straightforward—to facilitate the use of U.S. ports for the transshipment of goods in foreign commerce."); *Fountain v. New Orleans Pub. Serv., Inc.*, 387 F.2d 343, 344 (5th Cir. 1967) ("The purpose of [FTZs] is to expedite and encourage foreign commerce . . . without subjecting same to the customs laws of the United States."); *A.T. Cross*, 467 F. Supp. at 50 (suggesting that the purpose of the FTZ Act is to allow American workers and companies to "profit from the breaking

down, repacking and relabeling of the goods" temporarily stored there).

Moreover, the reasons given in *R.J. Reynolds* for distinguishing FTZs from CBWs are inapplicable here. When goods like cigarettes are bound for domestic use already, as Intrigue's were, exempting them from state cigarette taxes because they are stored in an FTZ will not adversely affect domestic industry or job creation. Indeed, like the local tobacco growers in *R.J. Reynolds*, domestic cigarette distributors would be disadvantaged by allowing Intrigue a tax exemption not afforded to unlicensed distributors storing cigarettes elsewhere in California. Allowing California to impose its tax on domestic-bound cigarettes would lead to "equal treatment for imported and domestic" cigarettes. *R.J. Reynolds*, 479 U.S. at 147.

The Eleventh Circuit similarly has found the *Xerox/R.J. Reynolds* dichotomy relevant in the context of FTZs. *See 3M Health Care*, 908 F.2d 918. The court in *3M Health Care* blocked Florida's effort to apply its Drug and Cosmetic Act to foreign pharmaceuticals being stored in an FTZ for eventual transshipment to Latin American countries. *Id.* at 919. Performing a similar preemption analysis, the Eleventh Circuit held that allowing Florida to regulate products that would never actually enter the domestic market would "encumber the ease of transshipment through the zones . . . [and] frustrate[ ] the goal of the Foreign Trade Zones Act." *Id.* at 921. In doing so, the Eleventh Circuit relied on the Supreme Court's *Xerox/R.J. Reynolds* distinction between goods that are in transshipment and those destined for domestic sale. *Id.* at 922 n.6.

**[25]** We find distinguishable the state and federal cases cited by Intrigue that have limited state taxing authority within FTZs. *See Hostetter v. Idlewild Bon Voyage Liquor Corp.*, 377 U.S. 324, 333-34 (1964) (holding that New York lacked power to regulate duty-free liquor shops, which are

technically FTZs, in airports); *McGoldrick v. Gulf Oil Corp.*, 309 U.S. 414, 428-29 (1940) (holding that New York did not have the power to tax oil imported into a customs-bonded warehouse that was then reprocessed and sold to vessels in foreign commerce); *During v. Valente*, 46 N.Y.S.2d 385, 387 (App. Div. 1944) (holding that sale of alcohol in an FTZ "was not subject to local regulation or tax"). All of these cases addressed state regulation or taxation of goods that were in the stream of foreign commerce, as opposed to goods like Intrigue's cigarettes that were destined for domestic consumption. Moreover, all of these cases pre-date the Supreme Court's opinion in *R.J. Reynolds*. We believe that, post-*R.J. Reynolds*, the operative framework is the transshipment/domestic consumption dichotomy, and we will straightforwardly follow it. Because Intrigue's cigarettes were bound for domestic consumption and there is not "any suggestion that taxation here would conflict with the central purpose" of our country's system of foreign trade zones, *R.J. Reynolds*, 479 U.S. at 148, we fail to see any conflict between imposition of the California cigarette tax and the goals of the FTZ Act. That the CCTA regulations exempt from forfeiture all cigarettes in an FTZ except for those in the situation presented here ("domestic status" cigarettes) only confirms the correctness of this result. 27 C.F.R. § 646.143(g).

**[26]** We therefore hold that state excise taxes on merchandise stored in FTZs for eventual domestic consumption are not expressly preempted by federal law. Nor has the federal scheme for FTZs so occupied the field as to prohibit state taxation. Finally, imposition of California's cigarette tax does not create an irreconcilable conflict with the FTZ laws, at least when the goods taxed are already duty-paid and bound for domestic consumption.[10]

---

[10]We do not reach the question of whether a state or local tax imposed on domestic-bound goods that have not yet been "entered into" the United States would conflict with the purpose of the FTZ Act.

## IV.   ATTORNEYS' FEES

[27] The district court awarded attorneys' fees based on its grant of summary judgment to Intrigue. Because we reverse that judgment, we vacate the fee award. *Baffert v. Cal. Horse Racing Bd.*, 332 F.3d 613, 617 (9th Cir. 2003); *Lovell v. Poway Unified Sch. Dist.*, 90 F.3d 367, 373-74 (9th Cir. 1996).

## V.   CONCLUSION

California has made the decision to impose its cigarette tax on unlicensed distributors who store cigarettes within the state for future sale in another state, including those cigarettes stored in FTZs. That decision is not preempted by the express language of the Foreign Trade Zones Act, nor does it conflict with the general purpose or intent of Congress in establishing foreign trade zones. Though Intrigue's motives may have been pure, and it may simply be the victim of bad legal advice or a poor gamble on the outcome of unsettled law, Intrigue's cigarettes were ultimately found in California without California tax stamps. That was sufficient, under the CCTA, to allow the federal government to seize and forfeit them.

The storage of goods in foreign trade zones is "closely regulated," and Customs officials are empowered by statute to search and inspect merchandise in foreign trade zones without a warrant. Customs officials had probable cause to believe that Intrigue's cigarettes were counterfeit, and it lawfully seized them. Probable cause for the seizure never dissipated, because the Rudalevige test was not conclusive and because, by the time the cigarettes were demonstrated to be genuine, the Customs Service had developed probable cause to believe that the cigarettes otherwise violated importation laws. The search and seizure both comported with the Fourth Amendment.

We therefore **AFFIRM** the denial of the motion to suppress, **REVERSE** the grant of summary judgment, **VACATE**

the award of attorneys' fees, and **REMAND** with instructions that summary judgment be granted to the United States.